### MORRIS RANGER v. DANIEL SARGENT.

R. & Co. being sued on a draft drawn September 3d, 1866, on the faith of a letter of credit, as follows: " The bearer, W. H. R., is authorized to draw " on us for six hundred dollars specie. Houston, August 31st, 1866. R. & " Co." They pleaded that since the giving of the letter of credit, they had paid to W. H. R. and to his order more than the sum specified in the letter of credit, whereby the authority conferred by said letter had been exhausted; and that the plaintiff, by the exercise of ordinary diligence, could have ascertained these facts. *Held* to be a good defense. That though the instrument sued on was a general letter of credit, in that it was directed to no particular person and limited to no time or place; yet it was special in that it was limited in amount, and a party making advances on it was bound to make inquiry whether it had been paid, or the authority to draw exhausted; and *held further,* that when the defendants delivered the letter of credit it became the absolute property of the holder, and they lost all control over it.

APPEAL from Galveston. Tried below before the Hon. C. B. Sabin.

The principal facts of the case are sufficiently stated in the opinion of the court.

The court below instructed the jury that, if they believed the plaintiff loaned the money mentioned in the draft to Russell upon the strength of the authority to draw, they must find for

plaintiff the amount of the draft and interest, and refused the following instructions asked by defendants:

*First.* That the letter of Russell was authority to draw on defendants to the amount of six hundred dollars, and to that amount bound defendants. But if they believed from the evidence that, prior to the date and presentation of the draft sued on, Russell had drawn for and received the full sum of six hundred dollars, defendants were not further bound for the payment of his drafts.

*Second.* If they believed from the testimony that the draft sued on was taken by plaintiff without due caution and inquiry, such as an ordinarily prudent man would exercise in a business transaction; or if they believed from the testimony that said draft, having been taken by plaintiff, was not presented for payment with due diligence, and that in the meantime the funds of Russell, six hundred dollars, had been fairly exhausted, they must find for defendants.

Verdict and judgment were had for the plaintiff for the amount of the draft and interest. 'A motion was made for a new trial, which was overruled, and the defendants appealed.

*Ballinger, Jack & Mott,* for the appellants.

The letter prescribed nothing as to the form of the draft. A party taking a draft from Russell might have been wholly ignorant of the letter, but the obligation of Ranger & Co., by their letter to Russell, would none the less have compelled the payment of the draft, if drawn before the amount was exhausted.

No person could have rights under this letter other than those conferred on Russell. The authority was to Russell. No direction of time, or mode, for its exercise. All parties were, therefore, put on inquiry, whether, or to what extent, the authority had been already exercised. There is not a syllable to justify the inference that the authority is to be continuing, beyond the actual fact of its exercise, whenever or however that may have taken place. All implications outside of the letter are without foundation, in right or in usage.

In Nisbett *v.* Galbraith, 2 Lou. An. R. 690, a letter of credit was given, as follows:

                "New Orleans, May 8th, 1847.

" *W. A. Whitaker, Esq., St. Louis, Mo.:*

"SIR—You are hereby authorized to value upon us to the " amount of five thousand dollars, in your bills upon us at from " twenty days to four months' date, in sums to suit your con- " venience, and the same will be accepted by us and paid at " maturity.         Your obedient servants,

              " GALBRAITH & GREENFIELD."

The suit was on a draft drawn on this letter, and was de- cided against the plaintiff by the judge below, because the par- ticular draft was not specified in the letter. The defendant below had pleaded also that the amount had been overdrawn previously to this draft, but offered no evidence of this.

The Supreme Court say:

"What did Galbraith & Greenfield mean by this letter? " *    *    We think nine merchants out of ten, if this letter " had been shown to them and the question put, would have " said; 'The object of this letter is to give Whitaker credit, " ' and induce the public to take his bills by their promise to " ' honor them, and if I take his bill on Galbraith & Green- " ' field, I have the security of their names, *unless Whitaker has* " ' *overdrawn.*'"

It did not occur to the court that the letter alone was to be looked to for evidence of the drafts which might have been drawn, but the takers of any draft run the risk that he had already overdrawn. And with respect to the defense of over- draft, instead of referring to the back of the letter, they say:

"There is no evidence that the defendants have ever paid " a dollar upon bills of Whitaker; so that there is no ques- " tion here as to an infraction of the limits prescribed by the " authorization to draw."

Aldrichs *v.* Higgins, 16 Serg. and R., 216. A letter was given as follows:

"Hartford, Dec. 12, 1832.

" *To any Gentleman in the City of New York:*

"Lewis C. Aldrichs, a young gentleman living in this place, "having a desire to enter into trade in a small way, and feeling "ourselves confident of his well managing the business, we "here offer ourselves in security to any gentleman who may "feel disposed to give him credit not exceeding seven hundred "dollars, to be bound and held firmly by this writing to pay "the said sum of seven hundred dollars, or any sum less, as "the said Aldrichs may think proper to contract."

The court held that the givers of the letter were only bound for a single and first purchase of goods, and not for continuing purchases, although they did not altogether exceed seven hundred dollars. To same effect, Ten Eyck *v.* Vanderpoel, 8 Johns. R., 120. These latter decisions are not directly in point. But they serve to illustrate that, instead of being an unlimited credit, requiring endorsements to show that its authority had been exercised, such a letter puts all parties on inquiry as to the actual authority which has been exercised and remains under it.

In 2 Parsons on Notes and Bills, 109, Note (A), the writer says:

"In Orr *v.* Union Bank of Scotland, 1 Macq., H. L. Cas. "513, it was held in the House of Lords, on an appeal from "Scotland, that the rules applicable to negotiable securities do "not hold with respect to letters of credit. The letter of credit "there was in this form : ' Please to honor the drafts of A. to "'the extent of £460 9s., and charge the same to the account "'of B.' Lord Cranworth said : 'I am not at present satisfied "'that there is any distinction between a letter of credit and "'any other security.' Lord Brougham said : ' I am inclined to "'think there is no very great novelty or peculiarity in letters "'of credit to take them out of the general law applicable to "'mandates. I am not aware that there is anything in the

" ' mercantile law, or the custom of merchants, to distinguish
" ' them from any other authority to pay money.' "

This Report is not in our library, nor accessible to us.  1
Fisher's Digest, 629, refers to it, and contains these further
principles from it:

" When, for a sum paid down, a banker grants a letter of
" credit, he must show that it has been complied with, or pay
" back the money.

" In such a case the banker cannot insist on having the letter
" of credit brought back to him.

" The rules applicable to negotiable securities do not hold
" with respect to letters of credit."

The case seems to be this : The Union Bank, for £460, paid
to it by Orr, gave him a letter to one of its correspondents to
honor Orr's drafts to that amount.   Orr came back to get his
money from the bank, and the court held that, although the
letter was not returned, the bank was compelled to show
that the money had been drawn on the letter, or 'pay it back.
The principles of negotiable securities did not apply to the
letter.   The party had the right to come back and get his
money from the giver of the letter, and if this was done,
the letter was not capable of any misuse to his further in-
jury, because the party could only pay money on it at his
peril.

Says Parsons, in the text from which I have quoted the
above note:

" Unless it assumes the form of a sale and purchase of
" bills of exchange, it does not come under those peculiar
" rules of the law merchant which relate to negotiable paper,
" *but is governed by the general principles of the law of con-*
" *tracts.*"—2 *Notes and Bills*, 10,819.

That is to say, this letter, authorizing Russell to draw on
Ranger & Co. for six hundred dollars, did not even carry the pre-
sumption of a negotiable promissory note.  It did not conclusive-
ly import a consideration.  Any one acting upon it did so at the
risk of all equities and defenses which Ranger & Co. might

have against it. If it had been obtained by fraud, and without consideration, Ranger & Co. might show it. If it had been paid off and discharged in any manner, they could set up the defense. It stood upon the same footing that any other contract, giving authority to Russell, would stand upon, as an authority to buy goods or to buy horses.

But in this case the effect sought to be given to the letter is not merely that of negotiable paper, conclusive of an original consideration, and of a right to draw, but to engraft on it a mode of execution, and a continuance until so executed, entirely foreign to its terms, and which would be of the most dangerous and alarming consequences.

*L. A. Thompson & Leslie Thompson, Jr.*, for appellee.

The document set forth in petition of appellee, and therein styled a letter of credit, is rightly styled a letter of credit. Mr. Justice Story, in his admirable work on Bills of Exchange, says: "A letter of credit (sometimes called a bill of credit) is " an open letter of request, whereby one person (usually a mer- " chant or banker) requests some other person or persons to ad- " vance moneys, or give credit, to a third person, named therein, " for a certain amount, and promises that he will repay the same " to the person advancing the same, or accept bills drawn upon " himself for the like amount. It is called a general letter of " credit, when it is addressed to all merchants, or other persons " in general, requesting such advance to a third person; and it is " called a special letter of credit, when it is addressed to a par- " ticular person by name, requesting him to make such advance " to a third person." (Story on Bills, 2d Ed., pp. 590 to 593, Section 459.)

This letter of credit is, then, a *general* one, authorizing W. H. Russell to draw upon Ranger & Co., to the extent and for the amount of six hundred dollars, specie. It is addressed to no one in particular, but to all—to the public at large. Russell, then, being authorized by appellant to draw upon him for six

hundred dollars specie, and Sargent having made an advance to Russell solely upon the faith and credit of aforesaid letter of credit, and having upon the faith of said letter taken a draft for the amount of his advance to Russell from Russell upon Ranger & Co., Ranger & Co., the letter-writer, is positively bound to Sargent, who, upon the faith of said letter, made the advance to Russell. (Story on Bills, 2d Ed., pp. 595, 596, and 597, Sections 461, 462; Lawrason *v.* Mason, 3d Cranch's R., 492; Boyce *v.* Edwards, 4 Peters' R., 121; Adams *v.* Jones, 12 Peters' R., 207, 213; 5th Hill's R., 642, 643; Russell *v.* Wiggins, 2d Story's R., p. 213 *et seq.*; 26 Wend. R., p. 425.)

" And it has been further held," says Justice Story, " that if " the engagement be to accept and pay any bills, not exceeding a " limited amount, drawn by the person to whom and for whose " benefit the advance is to be made; in such a case, the person " taking such bills, and making the advance upon the faith " thereof, if the promise of the letter-writer cannot be treated as a " *positive* acceptance of such bills, is entitled to treat it as a direct " promise to himself to accept and pay such bills, which promise " he may enforce, accordingly, in an action in his name, found- " ed upon such a letter of credit, against the writer thereof."

(Story on Bills, 2d Ed., p. 597, Section 462; Wildes *v.* Savage, 1 Story's R., pp. 22, 26, 27; Coolidge *v.* Payson, 2 Wheat. R., 66; Ogden *v.* Gillingham, 1 Baldwin's R., 45; Bradly *v.* Carey, 3 Greenleaf's R., 234; Adams *v.* Jones, 12 Peters' R., 207, 213; and Note 2, pp. 597, 598, 599, 600, 601, 602, 603, 604, 605, 606, and 607, Story on Bills, 2d Ed.)

Ranger & Co., therefore, having given Russell in their letter of credit authorization to *draw* upon them (R. & Co.) for six hundred dollars specie, and Sargent upon the faith of that letter, having advanced money to Russell and taken Russell's draft upon Ranger & Co. for the amount so advanced, Sargent was entitled to consider the said letter of credit as a direct promise to himself, from Ranger & Co., to accept and pay such draft, and Ranger & Co. were bound in law to accept and pay said draft to Sargent upon presentation and demand. In the

commercial world letters of credit of this character are treated as in the nature of negotiable instruments ; and the party giving such a letter holds himself out to all persons, who would advance money on bills drawn under the same, and upon the faith thereof, as contracting with them an obligation to accept and pay the bills. Upon any other understanding, letters of credit could never possess any general circulation and credit in the commercial world.

No one is supposed to advance money upon such a letter of credit, upon the mere credit of the party to whom the letter is given, and no man ever took bills on the faith of such a letter without a distinct belief that the drawee, the letter-writer, was bound to him to accept the bills when drawn, without any reference to any change of circumstances which might occur in the intermediate time between the giving of the letter of credit and the drawing of the bills under the same, of which the holder, advancing the money, had no notice. In the case at bar it needed no presentation within a reasonable time to fix the liability of Ranger & Co. to accept and pay Russell's draft in favor of Sargent. The letter of credit, the draft of Russell in favor of Sargent on the faith of said letter, and the advance made by Sargent to Russell, on the faith of the letter of credit, fixed the liability of Ranger. Sargent did not seek to fix the liability of Russell, the drawer of the draft.

It may be urged by the appellant here, that before Sargent took Russell's draft upon Ranger & Co., and advanced money to Russell upon the faith and credit of Ranger & Co.'s letter of credit, he should have inquired from Ranger & Co., if Russell had exhausted the power to draw conferred by the said letter of credit, and further, if Ranger & Co. would accept and pay Russell's drafts. We contend that such precautionary measures were wholly unnecessary. Nothing contained in the said letter, nor in any endorsement thereon, was of such a kind or nature as to put any prudent or cautious man upon inquiry. The letter of credit was in the *possession of Russell ;* the only endorsement thereon was one that showed that on the faith

and credit of that letter Sessums had advanced· to Russell one hundred and seventy-two dollars and ninety cents.

The signature of Ranger & Co. was well known; the only endorsement on the letter showed that the six hundred dollars specie had not been exhausted; Sargent was not bound to extend his inquiries further; there was nothing suspicious either about the letter itself, or the person who sought an advance on the faith of it. Besides, the very object in the issuance of the letter of credit was to enable Russell to obtain the sum named therein without the necessity of an application to Ranger, in such sums as would meet his, Russell's, convenience or necessity.

If Russell had, prior to the advance made him by Sargent on the faith of the letter of credit, exhausted the six hundred dollars specie mentioned in the letter of credit, then we ask why was Russell permitted to retain *possession* of the letter of credit, a general one, addressed to the public at large, and conferring a power upon Russell to draw upon Ranger & Co. to the extent of six hundred dollars specie? In permitting Russell to retain possession of the letter after, as they assert, the authority to draw had been exhausted, and the six hundred dollars specie paid out to him personally and in payment of his drafts, did Ranger & Co. act like prudent, cautious, correct, and squarely honest business men? We think not, but rather their conduct was that of gross criminal negligence.

From the statement of facts, appellant's testimony, we gather —that on August 31, 1866, appellant paid on *Russell's account*, draft in favor of A. Sessums one hundred and seventy-two dollars and ninety cents; on same day appellant paid Russell two dollars and ninety cents; on Sept. 1 appellant paid *Russell cash* three hundred dollars; on same day appellant paid draft in favor of S. Harlan four hundred and eighty dollars; on Sept. 3 draft in favor of Sam. Sterne three hundred and fifty dollars and forty-five cents; on same day draft in favor of S. W. Wren & Co. one hundred and thirteen dollars and fifty cents; amounting in the aggregate to sixteen hundred dollars. So if the six hundred dollars mentioned in the letter of credit had been paid

out, and the letter of credit completely exhausted, it was so exhausted on the 1st day of September, A.D. 1866. Where we find, according to the evidence adduced on the part of the appellant, that nine hundred and fifty-five dollars and eighty cents gold had been paid out on account of Russell, of which amount Russell had been paid in cash to himself the sum of *three hundred and two dollars and ninety cents, gold;* the credit for the six hundred dollars in the letter of Aug. 31 still outstanding.

Surely, if correct ideas of business and common honesty had controlled Ranger & Co., they should have demanded on the 1st day of Sept., A.D. 1866, the letter of credit from Russell, as appellant asserts the letter had been more than exhausted on that day, or should they, as the letter was a general one and addressed to the public at large, have given public notice that the letter of credit was exhausted, and that the same was recalled; and that they would pay no further drafts drawn by Russell for advances made upon the faith and credit thereof. This appellant should have done, had he desired to excuse himself from further liability, and to prevent the public from being deceived and imposed upon. And further, had appellant been a prudent, cautious, fair-minded business man, he would have required the amount of each draft drawn upon the faith and credit of that letter to be endorsed on said letter of credit, and when the said letter was exhausted, he would have obtained possession of the same; or, in default of that, would have warned the public in the most public manner against making further advance on the faith thereof. To have acted thus would have been the acts of an honest, prudent, cautious, fair-minded man. But appellant having acted otherwise, he cannot now come before this court with clean hands, and skirts unstained with fraud and deceit. He who asks equity must do equity.

The only advances made on the faith and credit of that letter, we take it, were the advance made by Sessums and the advance made by Sargent, both of which were endorsed upon the letter of credit, the two advances making, in the aggregrate, the sum of five hundred and twenty-two dollars and ninety cents, gold.

But we contend further, that the defendant below, appellant here, *is estopped in pais* from setting up as a defense, as against appellee, the exhaustion of the letter of credit by Russell, prior to, or at the time of the advance by Sargent to Russell on the faith of said letter of credit, and prior to or at the time of the drawing of the draft upon Ranger & Co., by Russell, in Sargent's favor; Ranger & Co. having, by their letter of credit to Russell, caused Sargent to believe that Ranger & Co. would accept and pay all drafts or bills not exceeding in amounts the amount specified in said letter of credit that might be drawn by Russell, on the faith of said letter, for any sum or sums that might be advanced him by any person or persons on the faith of said letter, and having had it in his (Ranger & Co.'s,) power to have recalled said letter, or to have given public notice of his determination to accept and pay no further drafts drawn by Russell on the faith and credit of said letter, after the fund specified in the letter had been exhausted, and the authority to draw conferred by the letter upon Russell determined and at an end. If, then, the fund had been paid out, and the authority conferred by the letter exhausted, prior to the 3d day of September, A.D. 1866, the date of the draft by Russell on Ranger & Co. to Sargent, and the date of the advance by Sargent to Russell on the faith and credit of the letter of credit, it would have been the bounden duty of Ranger & Co. to have recalled the letter, or given public notice of its recall; but having failed to do either, and having permitted Russell to retain *possession* of the letter of credit, appellant is estopped from setting up, as against Sargent, an innocent party without notice, a different state of things as existing at the time of the advance by Sargent to Russell on the faith of the letter of credit, and the taking by Sargent of Russell's draft on Ranger & Co., than Sargent was caused and induced to believe did exist by their letter of credit, with endorsement thereon of Sessums' advance ($172.90), then and at that very time in Russell's possession. Ranger & Co.'s conduct in this matter is indicative of such a high degree of gross negligence as to amount to con-

structive fraud upon his part. "The rule of law," says Lord Denman, in delivering the opinion of the court in the case of Pickard *v.* Sears (6 Ad. & El. R., p. 469, S. C. Eng., C. L. R., p. 117), "is clear, that, where one by his *words* or *conduct*, willfully causes another to believe the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring a different state of things as existing at the same time." And again Lord Denman says, in Gregg *v.* Wells, 37 Eng. Com. L. R., p. 58, "Pickard *v.* Sears was in mind at the time of the trial, and the principle of that case may be stated even more broadly than is there laid down. A party who *negligently* or willfully stands by and allows another to contract on the faith and understanding of a fact which he can contradict, *cannot afterwards dispute that fact in an action against the person whom he has himself assisted in deceiving.*"

To the same point, we refer your Honors to 1 Story's Eq. Jurisp., 5th Ed., pp. 411, 412, 413, 414, 415, and 416, Sections 384, 385, and 386. Broome's Legal Max., 2d Lond. Ed., 1848, pp. 218 to 221 inclusive.

See also decision of this court by Lipscomb J. in Love *v.* Barber, 17 Tex. R., 318.

OGDEN J. The primary question presented in the record in this cause, for our consideration and determination, is the proper construction of the following instrument of writing :

"The bearer, William H. Russell, Esq., is authorized to draw
" on us for six hundred dollars specie.

(Signed)          "RANGER & Co.

" Houston, Aug. 31, 1866."

On the 3d day of September, 1866, William H. Russell presented the above instrument to Daniel Sargent, who, on the faith of the same, advanced him three hundred and fifty dollars, and took his draft on Ranger & Co. for the amount, and on presentation of the draft, Ranger & Co. refused to pay the

amount specified, for the reason that they had, since giving the authority to Russell, paid to him and his order more than the sum specified in the letter, and that he had thereby exhausted the authority to draw; and they claimed that they were no longer bound to honor or pay his drafts.

That the written authority of Ranger & Co. to Russell, to draw on them for six hundred dollars, may be classed under the general appellation of a letter of credit, there can be no doubt; but whether it be a general or special letter of credit, as defined in the text-books, is not so easily determined, for the reason that the authorities have failed to agree as to what shall constitute the distinguishing characteristics of a general or special letter of credit; and for the further reason that the instrument under consideration is peculiar to itself alone—having most of the characteristics of a general and special letter of credit combined. It is general, in that it is directed to no one and is limited to no time or place, and it is a special or particular letter of credit, because it is written for the especial benefit of the person in whose favor it is drawn, and it binds the drawee to pay to Russell, if he should see fit to demand it, or to his order, the sum of six hundred dollars. But there can be no doubt that the instrument was intended as a letter of credit for a limited sum or amount, and must be construed as such. This character of mercantile or commercial paper has been in use for many centuries, and the usual form of all letters of credit is to limit the holder to a certain amount, for which he is entitled to draw; and the question presented in this record for our decision is, will such a limitation be good and binding against the parties and the public generally? As to the parties themselves, whether it be the maker, the party addressed, or the party to whom the credit is given, there can be no doubt; for, with them, the letter is the best evidence of the object and extent of the credit conferred.

But it is contended that the public are not bound by the facts of the case, or the intentions of the parties; and that unless the letter of credit bears the evidence that the authority has

been exhausted, the holder may draw for the full amount speci-
fied in the limitation for an indefinite number of times, and the
maker has no protection but in the revocation of the authority.
If this be true, then a letter of credit would be a dangerous
thing indeed, and every person who gave an instrument of this
kind would place himself, financially, entirely within the power
of the person who received the credit.

These letters of credit were introduced into use for the ex-
press purpose of being used in a foreign or distant country, and
if the doctrine established by the judgment of the District
Court in this case be the law of the land, then Russell, on
receipt of the letter in this case, had he been so disposed, could
have gone to New York or elsewhere and drawn for every
dollar of property appellants ever owned or possessed. And
yet this is a very common form of letter of credit or authority
to draw, used by travelers, merchants of every grade and
character, shippers, lawyers, and agents generally. And while
our law reports are quite full of cases growing out of the use of
letters of credit, yet we have not been able to find a case where
the doctrine held by the District Court in this case has been
enunciated or attempted to be enforced. We have been able
to find but few cases where this question has been discussed or
decided, and in each case where that question is raised or re-
ferred to, the authorities appear uniform in holding to the
doctrine that would relieve appellant from all liability beyond
the six hundred dollars. (Birckhead v. Stewart, 5 Hill, 634;
Ulster County Bank v. McForlan, 5 Hill, 432; Russell v.
Wiggin, 2 Story, 214; Aldricks v. Higgins, 16 Sargent &
Rawle, 212.) In the last case, the court says : " It (the letter of
" credit) was intended as an introduction to business in New
" York, for Aldricks, binding the signers in an amount not ex-
" ceeding seven hundred dollars. It can hardly be supposed that
" they intended a credit unlimited in time for that amount."

The other cases are not all so directly upon the question at
issue, but they most clearly recognize the right of a party in a
letter of credit to limit his responsibility, not only as to time

and place, but also as to the extent. We have examined the authorities referred to in appellee's brief so far as they are accessible to us, and from them we have formed a different opinion as to the law in this case, to that to which appellee's counsel have come.

This letter is a peculiar one, and not in the usual form of a letter of credit, as it is directed to no one, and asked credit for the bearer of no particular person, but simply declares that Russell has credit with the house of Ranger & Co., to the amount specified; and is in the nature of a personal promise to pay to Russell or his order; and he who should make advances on the same would do so at his peril, unless he retained possession of the letter of credit to present with his draft; and even then he should know that the authority had not been exhausted. This letter, when executed and delivered, became the property of Russell, and Ranger & Co. had no power or authority to recall it. And though they might have published a revocation of the authority, yet, according to the doctrine held by the lower court, if Russell could have got beyond the reach of the notice of revocation by publication, he could still have used the letter, and Ranger & Co. would have been responsible for the use to an unlimited extent.

It is claimed by counsel that drafts drawn on this letter of credit should have been endorsed on the same, and as none were endorsed, then Ranger & Co. should be held responsible. But it should be remembered that the letter, and the power to require an endorsement, had passed from the hands of Ranger & Co., and this rule would still place them at the mercy of Russell. And even if the letter of credit had required that all drafts drawn on the credit of that letter should be endorsed on the same, still this would be an unsafe rule to follow, as Russell held the letter and would have in his power the endorsements and the evidences of the responsibility of Ranger & Co.

We are of the opinion that the instrument of writing here exhibited as the authority of Russell to draw on the house of Ranger & Co. partakes very much of the nature of a promissory

note after maturity; and consequently, the party who made advances on the credit of the same, was bound to make the necessary inquiry to learn that the same had not been paid, nor the authority to draw exhausted.

We are therefore of the opinion that there was error in the charge of the court, and that the same may have misled the jury. The judgment is therefore reversed, and the cause remanded, to be proceeded in, in accordance with this opinion.

Reversed and remanded.