JOSEPH SAN ROMAN v. MARIA ANTONIA DE LA SERNA.

1. An instrument as follows :

"BROWNSVILLE, March 16, 1870.

"The bearer hereof, Mr. Wm. Scanlan, is going through those parts with the object of purchasing mule stock. He leaves deposited in my hands the sum of eleven thousand one hundred ($11,100) dollars, which sum I hold subject to his order.

"JOSEPH SAN ROMAN."

*Held* to be in effect a letter of credit, upon which suit may be brought against San Roman as an acceptor of a draft drawn by Scanlan on him.

2. See case where the maxim "Who trusts most must suffer most" applies.

ON REHEARING.

3. A motion to dismiss for want of an error bond, under Article 1517, Paschal's Digest, where a *supersedeas* bond appeared in the record, overruled. That article does not require a cost bond where a *supersedeas* bond has been given.

4. *Held*, that the paper is a special contract, and not negotiable.

5. Letters of credit are special contracts, not to be treated as negotiable in the full sense and proper meaning of that term, nor to be construed as actual acceptances of bills or orders drawn under them, but rather as agreements to accept such as may be drawn in good faith and within the limits of the credit or deposit specified.

6. The exclusion by the court of evidence that the depositor had withdrawn his deposit upon which said paper was given, was error; so was it erroneous to instruct the jury that the possession of said paper was conclusive evidence of the drawer having money on which he had authority to draw, unless it appeared from the evidence that the deposit had been previously withdrawn.

ERROR from Cameron. Tried below before the Hon. W. H. Russell.

The facts appear in the opinion.

*Frank E. McManus*, for plaintiff in error.

*Powers & Maxan*, for defendant in error.

McAdoo, J.—This cause grows out of the following instrument of writing:

"BROWNSVILLE, March 16th, 1870.

"The bearer hereof, Mr. William Scanlan, is going through those parts with the object of purchasing mule stock. He leaves deposited in my hands the sum of ($11,100.00) eleven thousand one hundred dollars, which sum I hold subject to his order.

"JOSEPH SAN ROMAN."

On which instrument was noted the following:

"SOTO DE LA MARINA, April 4th, 1870.

"Under this date I have drawn two bills of exchange against Mr. San Roman, on account of the above mentioned deposit, in favor of Mrs. Ma. Anta. de la Serna and Don Francisco Echevernia, of this town, for the aggregate sum of $4341, of which I make note and sign that it may be known."

"WM. SCANLAN."

The testimony shows that on the day (April 4, 1870) on which the entry was made on the instrument, Scanlan drew a bill of exchange on San Roman, to the order of the defendant in error, for the sum of $3752, in payment of the price of a lot of mules and mares purchased by him from her.

The bill of exchange, when presented for payment to San Roman, was dishonered by him.

The reason assigned by San Roman for non-payment of the bill was, that Scanlan had withdrawn the eleven thousand one hundred dollars which he had deposited with him on the sixteenth of March, by a bill of exchange in favor of Francisco Armendiaz, of Matamoros.

This suit was not brought upon the bill of exchange merely, but the petition of the plaintiff in the court below set out all the facts in the transaction, charged fraud upon Scanlan and San Roman, and claimed that San Roman was bound for the payment of the amount of the bill of exchange, by reason of the facts alleged in the petition.

It is claimed by the defendant in error that the instrument executed and delivered by San Roman to Scanlan was not a mere certificate of deposit for eleven thousand one hundred dollars, subject to Scanlan's order, but was, in fact, a letter of credit.

The plaintiff in error claims that it was a certificate of deposit only, and that he was not bound to pay the bill of exchange of Scanlan in favor of Madame Serna, the entire amount of the deposit having been withdrawn by Scanlan before that bill of exchange was drawn.

This is the issue in the case, and in the court below it was held to be a letter of credit.

It *is* a certificate of deposit; is it a letter of credit as well? What do its terms import? It is not in the usual form of a mere certificate of deposit, nor in such form as one would ordinarily write a letter of credit. But no *form* of words is requisite in order to bind one who contracts an obligation of the kind. It is of no consequence, indeed, whether San Roman intended the instrument to be a letter of credit or not, so far as his liability might be concerned. If an instrument be so worded that it deceive those who deal upon the faith of it, and its language be such that a person of ordinary business understanding might reasonably be deceived by it, then the

maker of the instrument would be bound in equity to meet the consequence of his own negligence and folly.

Was Madame Serna deceived by the instrument? Did she part with her property upon the faith of it? And is its language such that it might reasonably deceive a person of ordinary business understanding?

The instrument is not addressed to anybody, as a letter, but its terms are such that it might be presented to anybody, and was evidently expected by the writer to be used by Scanlan in forwarding the business upon which he was entering. It was certainly not contemplated that it should be laid aside by Scanlan as merely an evidence to him of his deposit with San Roman.

The plain import of the instrument, we think, is about this:

*To whom it may concern:*

Mr. Wm. Scanlan is going into your country with the purpose of purchasing mules. He leaves deposited in my hands eleven thousand one hundred dollars, out of which to pay for purchases made by him, and I hold myself bound to all persons from whom he purchases mules to accept and pay his orders, not to exceed that amount.

This was doubtless the understanding of Madame Serna when she took the bill of exchange from Scanlan. That Scanlan intended, perhaps from the inception of his operation, to perpetrate a fraud, is not a matter of doubt. He certainly had the confidence of San Roman in an unlimited degree, otherwise his bill of exchange for the whole amount of the deposit with San Roman would not have been honored without a return of the document, so patent for mischief, which he held in his hands. San Roman trusted him with that document with not a dollar to back it; he deceived Madame Serna, and somebody

must suffer; as San Roman trusted most he must suffer most. This is the equity of the case. The verdict of the jury and the judgment of the court below have so determined, and we see no error in this determination of the matter, and must therefore affirm the judgment.

AFFIRMED.

Opinion rendered September 23, 1873.

*Browne,* for rehearing.

### AFTER REHEARING.

*Powers & Maxan,* for defendant in error, submitted a motion to dismiss for want of a writ of error bond, citing Paschal's Digest, Article 1517; 30 Texas, 560.

*William Alexander,* for plaintiff in error.

### ON MOTION TO DISMISS.

GRAY, ASSOCIATE JUSTICE.—A motion to dismiss the writ of error is submitted at this late day, although the case was heard and decided at last term and a rehearing granted.

None of the grounds for the motion, for irregularity in petition for the writ, misdescription, and such like, can be considered, under the rules of practice. They come too late. But the ground of want of jurisdiction can be entertained at any time. The ground alleged is, that there is no bond for costs, as is alleged to be required, under Section 13 of "An act further regulating proceedings in the District Courts," approved February 5, 1858. (Paschal's Digest, Article 1517.) That section does forbid the issue of writs of error in any case, unless bond to secure costs in the Supreme and District Courts shall first have been given. If taken alone, as the only provision on the

subject, it would be conclusive, for there is no bond in this case which separately or expressly provides for payment of costs. There is, however, a bond in double the sum of the judgment, for *supersedeas*, and providing for compliance with such judgment, order, or decree as may be rendered by this court, and for payment of all damages that may be awarded. This was given in compliance with the latter portion of Section 140 of the "Act regulating proceedings in District Courts," of May 13, 1846. (Paschal's Digest, Article 1495.) The practice under that act always recognized such a bond as covering the costs, and no doubt or question of it was made until long after the act of February 5, 1858, before cited. But the former portion of the Section 140 of the act of May 13, 1846, required the issue of writs of error when petition therefor was filed in any case, and transcripts to be delivered for filing in this court, without any bond for debt, costs or damages. Such writs issued without bond did not operate as *supersedeas* to execution of the judgment below, but costs were accumulated, for which the officers of court had no security, and could not get pay from irresponsible parties. It was solely to remedy this defect that Section 13 of the act of February 5, 1858, was enacted, and not to change the law and practice where *supersedeas* bonds were given under the act of 1846. It was not intended to require an additional bond for costs, nor even express mention of them in a *supersedeas* bond, but only to require a bond for costs in cases where there was no *supersedeas* bond.

Such was the clear and manifest design of the act of 1858; and after a careful examination of all the reported cases we can find none in conflict with this view, when considered with reference to the facts of each case before the court, except the case of Dawson v. Hardy, decided by the Provisional Supreme Court in 1870, and reported in 33 Texas, 198–201. It does not appear to have been

well considered; and if there be any other cases reported or unreported they are not in accordance with our opinion of the legislative enactments. We are of opinion that no bond expressly for costs on writ of error is required where there is a *supersedeas* bond.

The motion to dismiss is denied.

MOTION OVERRULED

Opinion rendered April 7, 1874.

## ON REHEARING.

*William Alexander*, for plaintiff in error.

*Powers & Maxan*, for defendant in error.

GRAY, ASSOCIATE JUSTICE.—This cause is again submitted, after a rehearing granted. The importance of the questions involved seems to demand careful examination, involving as they do the law governing letters of credit or guaranties and mandates, and their construction, the rights and duties of parties acting under them, and the remedy for their enforcement. The errors assigned on the record present and require a review of the whole case as presented in the court below.

The petition of defendant in error avers, that on the sixteenth of March, 1870, defendant was a banker at Brownsville, in Texas, of known responsibility in the region of Mexico where she resided, at Soto de la Marina, and on that day he made and delivered to one William Scanlan a written certificate of deposit or letter of credit, which was in the Spanish language, and when read in evidence, in English translation, was as follows, to-wit:

"BROWNSVILLE, March 16, 1870.
" *To whom it may concern, present:*
"The bearer hereof, Mr. William Scanlan, is going through those parts with the object of purchasing mule

stock. He leaves deposited in my hands the sum of $11,100 (eleven thousand one hundred dollars), which sum I hold subject to his order.

"JOSEPH SAN ROMAN."

That on the fourth of April following, Scanlan, having arrived in those parts where he resided, proposed to purchase mules from her agent; and that he exhibited said agreement of defendant as evidence of his ability to pay for them ; that her agent, acting solely on the faith of it, and of defendant's responsibility as a banker, and that he had formerly been accustomed to give such letters to parties, whose drafts or orders upon them had always been honored by defendant, did sell and deliver to Scanlan one hundred and forty-seven mules, of the value of $3752, and received from him in payment his draft or order upon defendant at Brownsville for that sum, to be paid to her order on his account, which was dated on said fourth of April, the day of the purchase by Scanlan, who then departed with the mules. That on the tenth of April she transferred and forwarded said draft to her banker at Tampico, who in due course caused it to be presented to defendant for payment on the thirtieth of April, who refused to accept and pay, and endorsed on it that he refused payment for reasons given in his letter of April 15 to plaintiff; whereupon the draft was returned to her in due course. That the reason given in said letter of April 15 by defendant was in answer to a letter from her of the 8th, advising him of the draft; that on March 18, two days after the letter or certificate of deposit had been given by defendant to Scanlan, the latter had drawn for the whole sum deposited in favor of Angel Maiz, of the house of Don Francisco Armendiaz, of Matamoros, Mexico, and that the deposit had been paid to that house on that day, where he presumed the money was ; and that Scanlan had no funds, and no authority to draw on him

when he gave her the draft, and that he enclosed her a
letter from Scanlan in regard to the matter.    That this
letter from Scanlan, dated April 13, at Matamoros, stated
that he had drawn in her favor on San Roman "*indebi-
damente*" (translated by plaintiff "wrongfully" in pe-
tition, but by her agent, Serna, in his testimony, as
"by mistake," and which literally means "without
funds"); that his draft should have been on the house of
Don Armendiaz, where the money was deposited,· and re-  ·
quested her to apply there for the value of the draft.

Petition then proceeds to allege that the draft has not
been paid, and that if the deposit had been paid as pre-
tended by defendant (which she does not admit), then it
was a sham pretense and fraud on her, for the purpose
of enabling Scanlan and Armendiaz.to embarrass her in
receiving her money, and to aid Armendiaz in enforcing
payment by her of an unjust and fraudulent claim which
he set up against her for about $5000 on account of one
Dewitt; that if defendant had paid the deposit as he al-
leged, he had not taken up his letter or certificate, but
allowed Scanlan to retain it for the purpose of deception;
that such practice was against the law and custom of
merchants, and that she had parted with her property to
Scanlan solely on the faith of his possession and exhibit
of the defendant's letter or certificate, and not on Scan-
lan's credit, who had no visible means wherewith to re-
spond.

The answer of defendant as to the facts (his demurrers
being overruled) denied all responsibility by reason of
his not having funds of Scanlan, and especially denying
all the allegations of sham pretense, fraud on the rights
of plaintiff, and that he connived with Scanlan to harass
her, or that he allowed his certificate of deposit to remain
in possession of Scanlan to be used for the purpose of
deception; and further alleging that he is not liable on
the draft, as plaintiff well knew before it was presented

for payment, and that she and her agent and Scanlan combined with each other to harass him. This portion of the answer was not demurred to by plaintiff, but stood as presenting the issues for trial.

The case made by plaintiff's petition was not a claim as holder or assignee by transfer in whole or in part of the letter of defendant, and based on its validity and binding effect as an acceptance of Scanlan's bill or order, but it disclosed a claim on the special facts in equity, the gravamen of her cause of action being the alleged gross neglect, or wrongful design, of defendant in allowing his letter to remain in possession of the irresponsible holder when he paid it, whereby that holder had been enabled to mislead and induce her to part with her property on the faith of that letter and his possession of it, to her injury, and which loss defendant was equitably bound to make good to her.

The ruling of the court on further answers, on evidence and in its charge, was based on a broader view of defendant's liability on his general letter of credit, as the court properly considered it to be. Pleas alleging specifically the payment of the deposit on Scanlan's order to Angel Maiz, and that he acted in good faith, etc., were struck out on demurrer. Evidence to prove the payment and circumstances of defendant's action under the answer as it stood was wholly excluded, although plaintiff had not directly admitted such payment to have been made in her petition. The charge, also, was based on the same view, and throughout maintained the proposition that, "So long as defendant, San Roman, allowed said Scanlan to remain with the letter of credit without actual notice to the plaintiff of his having withdrawn the funds mentioned in it, he, the said San Roman, is liable for any credit as taken up by said Scanlan in favor of the plaintiff, to the extent of the amount stated in said letter." The court also refused a charge requested, that "A general author-

ity to draw, as upon an open letter of credit, cannot be treated as an acceptance of bills drawn under such authority."

The verdict was for the plaintiff; and the motion for new trial overruled, and assignment of errors, both distinctly specify the various rulings of the court.

That the writing signed by San Roman and delivered to Scanlan was a contract of guaranty, known as a general letter of credit, appears from the authorities. There is little difference in the definitions given by elemementary writers or reports. (Story on Bills, Secs. 459, 460.)

The language of Justice Bronson in Birkhead v. Brown, 5 Hill (N. Y.), 642, is clear and perspicuous, both as to what are letters of credit and their general effect. He says: "Letters of credit usually contain a request that some one will advance money or sell goods to a third person, and an undertaking on the part of the writer that the debt which may be contracted by the third person, in pursuance of the request, shall be duly paid. These letters have been divided into two classes, general and special. They are general when addressed to any and all persons, without naming any one in particular. They are special when addressed to a particular person or firm by name. When the letter is addressed to all persons, it is in effect a request made to each and every one of them, and any individual may accept and act upon the proposition contained in it; and on his doing so, that which was before indefinite and at large becomes definite and fixed; a contract immediately springs up between the person making the advance and the writer of the letter, and it is thenceforward the same thing in legal effect as though the name of the former had been inserted in the letter at the beginning. I can see no difficulty in this, for there is plainly a privity of contract between the parties." For this he cites various American authorities, among others Boyce v. Edwards, 4 Peters, 111; Adams v. Jones, 12

Peters, 207; Lawrason v. Mason, 3 Cranch, 492; Russell v. Wiggin, 2 Story, 213; and Carnegie v. Morrison, 2 Metcalf, 381; and then significantly adds, "Whether this doctrine has not sometimes been carried beyond its legitmate limits, *so as to make contracts where there was no privity between the parties*, I will not now stop to inquire." But subsequently in the same opinion he does comment on the last two of those authorities at which this observation pointed, and questions the application made of the principles in those cases, but does not deny them as applied to general letters of credit.

In the case of Lawrason v. Mason, 3 Cranch, the letter was addressed to a particular person, yet its terms plainly indicated that it was intended to influence the action of any person who might accept its promise. Chief Justice Marshall expressively said that it was "an *actual assumpsit* to all the world, and any person who trusts in consequence of that promise has a right of action."

The same principle is asserted by Judge Story in Russell v. Wiggin, but the reasoning in the opinion delivered goes further, and maintains with remarkable cogency that such letters of credit (which he calls "circulating promises") are to be treated as negotiable instruments ; and that when bills are drawn in favor of another party acting on faith of them, they are to be held as acceptances of, or at least agreements to accept, such bills which the writer of the letter would be bound to pay "without reference to any change of circumstances which might occur in the intermediate time between the giving of the letter and the drawing of the bills under the same, of which the holder advancing the money had no notice." This is plainly applying to such letters, which are in fact guaranties and mandates, the mercantile law of negotiability applicable to regular bills of exchange and promissory notes. By that law an accepted bill, though paid by the acceptor before maturity and not taken up or re-

tired, if afterwards negotiated by the holder in due course of trade before maturity, will in the hands of the indorser be binding on the acceptor.. His payment before maturity (the time for which and sum to be paid are definitely fixed by the bill, without room for contingency or construction of the contract) not having been a regular payment usual in trade, could not reasonably have been suspected by the most prudent, and therefore would be no answer to the demand of an innocent third party. (Story on Bills, Sec. 417.) If, then, letters of credit are to be treated as negotiable to the same extent, so that bills drawn by the holder of them on the writer are to be deemed as accepted by him, the doctrine held by the court below in its charge was right, unless the state of the pleadings rendered it improper.

But it will be observed that in Russell v. Wiggin, and other cases maintaining this doctrine, the advances made were not only within the limits of the guaranty, but the holder of it, acting in good faith, had not exceeded the limit by overdraft. The extent of the credit had not knowingly been exhausted, nor the sum of deposit paid to his order according to the terms of the letter. No question therefore arose as to the effect of such fulfillment of the contract and bad faith of the holder. Had such a case been presented, it may be questioned whether the doctrine of negotiability would have been so broadly asserted.

Again, if we consider the nature and requisites of bills of exchange and negotiable promissory notes, and compare them with those of letters of credit, there is such marked difference between them that it is difficult to reconcile and apply the effects of the negotiability of the former to the latter. The rules governing the former are always the same, fixed and determinate ;, while the latter are to be construed with reference to the particular and often varying terms in which they may be expressed, the

circumstances and intentions of the parties to them, and the usages of the particular trade or business contemplated. (Lawrence v. McCalmont, 2 How. S. C. R., 449; Bell v. Bruen, 1 How. S. C. R., 169; Lee v. Dick, 10 Peters, 482; Mussey v. Rayner, 22 Pick., 228; Smith v. Dunn, 6 Hill, 543.)

In the case under consideration, it is questioned whether the letter is to be construed as a certificate of deposit, intended to be transferred for the whole sum by a single order, either by draft or indorsement, or whether it was designed to be used as a means of credit to the extent specified, payable upon successive orders or bills to different persons, at the option of the holder. Considering that the letter is written in Spanish, that it is addressed to all whom it may concern or be presented, and states that the bearer "is going through those parts with the object of purchasing mule stock" (that is, those parts where Spanish is spoken and mule stock is to be found for sale), and that he has left deposited this sum of money, "which I hold subject to his order," as translated (but literally, "*a su disposicion*" — at his disposition or control), there can be little doubt that the intention was to enable the bearer to draw orders on the deposit as convenience in making his purchases might require. It could hardly have been supposed that he would be likely to make a single purchase of mules for the whole sum from one party, though such a transaction may not have been impossible. Now, to hold that such a contract has the attributes of negotiability in favor of each person to whom successive orders might be given for portions of the sum deposited, without definite limit of the period in which they should be given, would not only be contrary to the rules of certainty required in bills or notes, but also tend to increase the risk of liability of the writer, arising from careless mistakes or even frauds between the holder of the letter and parties acting under it. Such a rule would

change the burden of proof necessary to avoid liability, although the writer had honestly paid the full amount of the deposit.

From these considerations, and others which might be urged, it is my opinion that all letters of credit are special contracts, guaranties and mandates, not to be treated as negotiable, in the full sense and proper meaning of that term. Nor is it believed that such letters are to be construed as actual acceptances of bills or orders drawn under them, but rather as agreements to accept such as may be drawn in good faith and within the limits of the credit or deposit specified.

It has been ably insisted in some of the cases that such doctrine is subversive of the beneficial use of letters of credit in commerce and otherwise, because it tends to weaken, if it does not destroy, their value abroad or on the Exchange, where they are intended to be used, and where advances on them are always made on the credit of the writer, and not on that of the stranger who holds them. There is force in this view, but it is not strictly true that such advances are made solely on credit of the writer, for the drawer of the bills is held responsible on them in case of the failure of the writer before payment. To some extent, therefore, the party advancing does look to the character and responsibility of the holder of the letter and drawer of the bills. It may be further answered that, if our view of the law is correct on principle, bankers and traders should conform their letters and contracts to those views, rather than that the courts should modify the law to suit the supposed convenience of commerce and forms of contracts which traders and bankers may see fit to adopt, and if the necessities of commerce require negotiable letters of credit, the parties interested can so make them.

But it is not believed that such consequences would result, at least to the extent supposed, from the doctrine

now maintained. For while such letters are special contracts, not negotiable, yet general letters of credit do make a general request to all the world, which may be accepted by any one to whom it may be exhibited, and acted upon by him so as to make it a contract with himself, which may be enforced in his own name at law or in equity. It is the result of many decisions that a party who acts in pursuance of a general promise or request is as much entitled to a remedy on it as if specifically made with himself. (Louisville Manf. Co. v. Welch, 10 How. S. C. R., 461; Union Bank v. Coster, 1 Sanford, 563, and 3 Comstock, 203; Watson v. McLaren, 19 Wend., 557, 566, and many others.)

Though the weight of authority in the law courts of England denies, not only the doctrine of negotiability, but also of privity of contract arising, which is maintained by the American courts, yet there, as here, relief can be had in proper cases in equity. The case of the Agra and Masterman's Bank, 2 Law R., Chancery Appeal Cases, 391 (cited in 2 American Leading Cases, 5th Edition, Notes to Lawrason v. Mason), in its practical result seems nearly equivalent to that in Russell v. Wiggin. It held that the assignee or holder of the bills drawn on faith of the letter of credit, and within limit of its authority, was entitled to relief "without reference to any collateral or cross-claims," or claim of debt to the writer from the persons who had received his letter.

But neither this case nor the others before cited clearly reach the question here involved, of the effect of full compliance with, or discharge of, the obligation of the letter to the holder of it, before the advances on it and sale of the bills, acceptance of which was refused. They all assume that the contract was in force between the writer and holder of it; that the latter had acted in good faith, and within the limit of the credit specified. In such case it is not difficult to perceive how privity of

21

contract arose between the writer and the third party mediately through the holder of the letter. But where there has been payment in full of it to the holder, or he acts in bad faith by drawing in excess of the credit limited on the face of the letter, it is not so easy to perceive how privity can then arise by virtue of and through the contract itself. It seems clear that plea and proof of such payment made in good faith would be a complete answer at law to a suit in assumpsit on that contract or agreement to accept and pay bills, unless the rules of pleading allowed replication alleging equitable grounds for relief. Clearly this could be done by the laws of Texas, either at law or by suit in equity setting out all the facts entitling to relief, by reason of matters outside of the mere possession of the letter by the holder, and such was the nature of plaintiff's petition in this case. With us such a suit can be maintained by the third party injured, in his own name, as assignee of the whole or any part of the credit or deposit, according to the intention of the parties to the letter of credit, either at law or in equity.

These considerations seem to be sufficient. The doctrine of estoppel by admissions in the letter, insisted on by appellee, does not apply, for the simple reason, if no other, that plea and proof of a subsequent payment of a deposit is not a denial of the fact that it was made at a prior date.

The principles of the liability of a principal to third parties, who act in good faith and give value to an agent, whose power has been revoked without notice to them, do apply to the case; but those principles are in accordance with those here maintained, as a careful consideration of the authorities will show.

Without commenting on the opinion delivered by our predecessors in Ranger v. Sargent, 36 Texas, 26, it will suffice to say, that if the contract there in question was a letter of credit, the decision is in accord with the view

now taken as a question of law. The case was presented as purely at law, and the contract treated in that view alone. No equitable circumstances, other than the want of notice of payment by Sargent, without inquiry, which he could have made, appeared.

The case before us was presented by the pleadings as a suit in equity on the whole facts alleged and denied. But the court by its rulings narrowed its trial by the jury to the simple issue of notice by plaintiff, when she sold her mules to Scanlan, that the money deposited had been drawn by him, although proof of the fact of payment by defendant had been excluded. In other words, the court held that the letter was negotiable, that its possession by Scanlan was conclusive evidence of his having money deposited with San Roman on which he had authority to draw for the purchase of mules from plaintiff, and that unless it appeared by evidence from defendant that she or her agent had notice that the deposit had previously been paid, she was entitled to recover of San Roman. How could it be made to appear that she had notice of a fact, proof of which had been excluded? The main fact of payment being excluded, it was useless for defendant to prove other matters which possibly might relieve him. This ruling and the charge were both erroneous, because contrary to the rules of law as herein indicated, and not presenting to the jury the issues made by the pleadings for trial.

From an inspection of the facts in evidence, as far as developed, it probably may be that substantial justice has been attained, but we cannot certainly so conclude in face of such mode of trial, which cannot be sanctioned as a precedent. The plaintiff in error had a right to trial of all the equitable issues presented by the pleadings, and if he had actually paid the deposit in the usual way and time for such payment, consistently with the nature of the letter issued by him and left outstanding, then he could

only be made liable on the equitable causes alleged, of which the burden of proof was on the plaintiff.

The judgment being erroneous, is reversed, and cause remanded for a new trial.

REVERSED AND REMANDED.