**SUGG et al. v. JOHNSON et al.   (No. 2423.)**

(Court of Civil Appeals of Texas.   Amarillo.
Nov. 25, 1925.   Rehearing Denied
May 26, 1926.)

**1. Trial ⟨⟩365(2).**

Answer of jury to special issue, sufficiently
supported by evidence, cannot be set aside or ig-
nored by trial court.

**2. Bills and notes ⟨⟩527(1)—Evidence held to
show note was never paid.**

In action to cancel note secured by deed of
trust, evidence *held* to rebut presumption of pay-
ment arising from deposit to payee's credit in
bank of amount equal to such note by maker,
who was officer of bank, and to show note was
never paid.

**3. New trial ⟨⟩70.**

It is trial court's duty to set aside verdict,
where special finding of jury is not warranted by
evidence.

**4. Appeal and error ⟨⟩930(3)—Issue not sub-
mitted to jury, nor requested to be submitted,
will be presumed on appeal to have been found
in such manner as to sustain judgment, and
finding cannot be set aside, if supported by
evidence (Vernon's Sayles' Ann. Civ. St. 1914,
art. 1985).**

Under Vernon's Sayles' Ann. Civ. St. 1914,
art. 1985, issue not submitted to jury, and not
requested to be submitted, will be presumed, on
appeal, to have been found in such a manner as
to sustain judgment, and, if there is evidence to
sustain finding, it cannot be set aside.

**5. Partnership ⟨⟩217(3)—Evidence held to
sustain implied finding that note was individual
obligation of one partner and that other part-
ner and his wife signed as sureties.**

In action to cancel note, evidence *held* to
sustain implied finding that note was not a part-
nership obligation, but was individual obligation
of one partner, and that other partner and his
wife signed as sureties.

**6. Estoppel ⟨⟩52—"Estoppel" is bar preclud-
ing denial of truth of fact settled by acts of
judicial or legislative officers, or of party, by
writing,. or by representations, express or im-
plied, in pais.**

"Estoppel" is a bar precluding person from
denying truth of fact which in contemplation of
law has become settled by acts and proceedings
of judicial or legislative officers, or by act of
party himself, either by conventional writing,. or
by representations, express or implied, in pais.

[Ed. Note.—For other definitions, see Words
and Phrases, First and Second Series, Estop-
pel.]

**7. Estoppel ⟨⟩96—Term "estoppel by negli-
gence" applies to estoppel by another's mis-
representation resulting from supplying such
person with that which will necessarily make
misrepresentation credible, in breach of duty
to person deceived.**

Term "estoppel by negligence" applies
where one is estopped by another's misrepresen-
tation where, in breach of some duty to person

deceived, he has supplied person making misrep-
resentations with that which will necessarily
make it credible.

**8. Estoppel ⟨⟩119—In sureties' action to can-
cel note, whether sureties were negligent in
surrendering certain escrow notes to maker
on being shown note, and release of deed of
trust securing it, held question for jury.**

In action by sureties to cancel note of in-
solvent maker .secured by deed of trust on
ground that payee by delivering such note, re-
lease of deed of trust, and deed of trust to mak-
er, thereby making it possible for maker to de-
ceive sureties and cause them to surrender cer-
tain escrow notes, was estopped to deny pay-
ment, *held*, that whether surety was negligent in
surrendering escrow notes without further in-
quiry was material issue which should have been
submitted to jury.

**9. Estoppel ⟨⟩120—In action by sureties to
cancel note, instruction that burden was on
payee to prove that, in delivering note and re-
lease of deed of trust securing it to insolvent
maker, he exercised reasonable care and cau-
tion of ordinarily prudent person, held errone-
ous.**

In action by sureties to cancel note of in-
solvent maker on ground that payee, by his neg-
ligence in delivering note and release of deed of
trust securing it to maker, injured plaintiffs and
was thereby estopped from asserting rights un-
der note, *held*, that it was error to instruct jury
that burden was on payee to prove that in so de-
livering note he exercised reasonable care and
caution of ordinarily prudent person.

*On Appellants' Motion for Rehearing.*

**10. Estoppel ⟨⟩96—Payee negligently sending
note and release of deed of trust securing it
to maker, or to bank of which maker was offi-
cer, held estopped from asserting any right
under note against sureties injured thereby.**

Where finding that payee was negligent in
sending note, deed of trust securing it, and re-
lease of deed of trust, to maker or to bank of
which maker was managing officer, was warrant-
ed by evidence, *held*, that payee was estopped
from asserting any rights under note as against
sureties thereon, thereby induced to surrender
certain escrow notes to maker, unless sureties
were negligent or acted in bad faith, notwith-
standing absence of intent by payee that maker
should show such instruments to sureties or that
sureties should act thereon to their detriment.

**11. Estoppel ⟨⟩96—Equitable estoppel may be
based on negligence, and it is not essential that
party estopped should have intended injured
party to act thereon; nor is fraud necessary.**

Equitable estoppel may be based on negli-
gence, and it is not essential that party estopped
should have intended by his acts that injured
party should act thereon; nor is bad faith, fraud,
or intentional moral wrong necessarily a matter
of consequence.

**12. Escrows ⟨⟩3—Payee's delivery of note and
deed of trust securing it to maker held not a
delivery in escrow.**

Payee's delivery of note and release of deed
of trust securing it to maker *held* not a delivery
to maker as escrow holder.

⟨⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Appeal from District Court, Roberts County; W. R. Ewing, Judge.

Suit by Montford T. Johnson and others against J. D. Sugg and another. Judgment for plaintiffs, and defendants appeal. Reversed and remanded.

H. E. Hoover, of Canadian, Embry, Johnson & Tolbert, of Oklahoma City, Okl., and Bailey & Hammerly, of Chickasha, Okl., for appellants.

J. B. Dudley, of Oklahoma City, Okl., Bond, Melton & Melton, of Chickasha, Okl., Coffee, Holmes & Coffee, of Miami, and Underwood, Jackson & Johnson, of Amarillo, for appellees.

RANDOLPH, J. The following statement of the nature and result of the suit is substantially the statement contained in appellants' brief, appellees having accepted such statement as being substantially correct:

The suit was brought originally in the district court of Hutchinson county, Tex., where the land in controversy is located, and by agreement of the parties the venue was changed and the case transferred to the district court of Roberts county. The case was tried on plaintiffs' first amended original petition, defendants' first amended original answer, plaintiffs' first supplemental petition, and the original answer of Mamie Johnson, and was submitted to the jury upon special issues.

The plaintiffs' first amended original petition was filed on the 8th day of September, 1923, in which plaintiffs, Montford T. Johnson, Neil R. Johnson, Graham B. Johnson, E. B. Johnson, and Mollie E. Johnson, of the county of Cleveland and state of Oklahoma, brought suit against the defendants J. D. Sugg and C. C. Kirkpatrick, of Tom Green county, Tex., alleging: First, an action of trespass to try title to the land in controversy; second, an action in the nature of a suit to cancel a note for the sum of $50,000 dated the 9th day of October, 1916, signed by Ben F. Johnson and E. B. Johnson and their wives, payable to J. D. Sugg, with interest at the rate of 8 per cent. per annum, the payment of which was secured by deed of trust upon the land in Hutchinson county in controversy, Kirkpatrick being sued as the trustee in said deed of trust. The amended ·petition also alleged, in substance, that Ben F. Johnson in truth and in fact was desirous of purchasing from one W. H. Johnson an undivided one-half interest in said land, and that money was borrowed for the purpose of making such purchase, and alleging that E. B. Johnson and wife were only sureties on the note, and that· Ben F. Johnson received the entire proceeds and the full use and benefit of same, of which Sugg had notice at the time the loan was made; further, that on the 2d day of July, 1919, Ben F. Johnson sold and conveyed his undivided

one-half interest in the land to the plaintiffs Montford T. Johnson, Neil R. Johnson, and Graham B. Johnson, and that as consideration for such conveyance they executed to the said Ben F. Johnson ten promissory notes, with vendor's lien retained, against said land, each for the sum of $17,711, aggregating $177,110, which were indorsed by E. B. Johnson. It is further alleged that the $50,000 note, according to the terms of sale, was to be paid and discharged by said Ben F. Johnson, and the deed of trust satisfied and released, and to this end the plaintiffs entered into a contract and agreement with the said Ben F. Johnson that three of said notes so executed, and hereinafter referred· to as the "escrow notes," should be deposited in the First National Bank of Norman, Okl., and should be held by it to secure the. guaranty that the said Ben F. Johnson would pay and discharge said $50,000 indebtedness to defendant Sugg, and should cause a release of the deed of trust lien held by Sugg to be executed by Sugg.

Plaintiffs then allege that the three escrow notes were in fact placed in the Norman bank, which bank continued in possession of same until about the 23d day of August, 1919, same being held under the contract and guaranty to protect the plaintiffs against the $50,000 note held by defendant Sugg, also alleging that said notes and the proceeds thereof should constitute a trust fund for the security of the payment of said $50,000 note. Further, plaintiffs allege that on or about the 18th day of August, 1919, the defendants Sugg and Kirkpatrick prepared, executed, and acknowledged a release of the $50,000 note and deed of trust lien, in the usual and proper form, which recited the execution of the note and deed of trust lien and stated that said indebtedness and all accrued interest ·thereon had been paid, and released and discharged the land from the lien to secure said indebtedness. It was also alleged that two or three days after the execution of the release, the plaintiff E. B. Johnson was at Chickasha, Okl., and then was shown by Ben F. Johnson the $50,000 note payable to Sugg and the release executed by Sugg and Kirkpatrick, and Ben F. Johnson advised E. B. Johnson that such indebtedness had been paid off and discharged and such deed of trust lien released, and requested E. B. Johnson to have the bank at Norman send him the three escrow notes, and that relying upon this evidence and the statements of said Ben F. Johnson, E. B. Johnson, acting for himself and the other plaintiffs, caused said escrow notes to be sent to Chickasha, Okl., and delivered to Ben F. Johnson, upon the agreement that the said Ben F. Johnson, upon receipt of such notes, would transmit the release by mail to Hutchinson county and cause same to be placed of record; that said escrow

notes were mailed from Norman, Okl., to the First National Bank of Chickasha, Okl., about the 23d day of August, 1919; that they were negotiable promissory notes secured by vendor's lien upon a one-half interest in said land; that they were not past due, were valid and binding, and were received by the First National Bank of Chickasha, Okl., and taken into the possession of said Ben F. Johnson, who, in violation of said agreement, did not mail said release to the county clerk of Hutchinson county, nor to plaintiffs, but held and retained possession of same and sold and negotiated the notes to the Security National Bank of Oklahoma City and are now held by the First National Bank of Oklahoma City, which last-named bank is an innocent purchaser of same; that by reason of the execution of such release and the delivery of the $50,000 note and permitting same to come into the possession of Ben F. Johnson, the deed of trust lien was in fact canceled and discharged, but that notwithstanding such fact, the defendants had conspired with Ben F. Johnson and failed and refused to deliver the $50,000 note and to release the trust deed lien, but that the defendant Sugg has possession of the note and release.

Said petition further alleges that after the execution and acknowledgment of said release, the same was delivered to Ben F. Johnson with the knowledge that the possession thereof would constitute evidence and acknowledge the defendants' release and discharge of said lien and indebtedness, and that the defendants knew that Ben F. Johnson was bound and obligated for the payment of the indebtedness shown by the $50,000 note, and that the defendants knew and were advised that the escrow notes were being held in the bank at Norman, Okl., under the agreement between the plaintiffs and Ben F. Johnson that the same should not be delivered to Ben F. Johnson until he had procured from defendant Sugg a release of the $50,000 and deed of trust securing same, and that Sugg knew at the time of the delivery of such release that Ben F. Johnson had contracted and agreed to pay the $50,000 note, and also knew that the escrow notes were not to be delivered to Ben F. Johnson until he had paid the $50,000 note, and that Sugg knew that the escrow notes constituted the security and guaranty against the $50,000 note and deed of trust.

It is further alleged in said petition that Sugg permitted the $50,000 note and the release of the deed of trust securing same to come into the possession of Ben F. Johnson with full knowledge that by delivering said instrument to Ben F. Johnson, he was placing same in his possession and control with the power and authority to exhibit such instrument in his possession to the plaintiffs as evidence of the discharge of such indebtedness which they might rely on, and would be justified in relying on, and of the statements in that connection which might be made by the said B. F. Johnson, and that it would be unfair and inequitable to permit said Sugg to dispute or contest the validity of the release or to deny that said lien had been discharged; also, that defendant Sugg was guilty of negligence in transmitting said release, the note, and deed of trust, to Ben F. Johnson, and placing same in his possession, by which means it was made possible for him to exhibit same to the plaintiffs and cause them to release the escrow notes; that the defendants were so grossly careless, negligent, and indifferent to the rights of plaintiffs; and that in the exercise of ordinary care they must have known that said Ben F. Johnson could make use of his possession of said release, etc., to obtain possession of the escrow notes and to thus defraud the plaintiff.

In paragraph 24 of their petition, it is charged that Ben F. Johnson about September 15, 1919, received $50,000 as the proceeds of the escrow notes, and thereafter, about the 26th day of September, 1919, he paid to Sugg the sum of $50,000 which was accepted and retained by the said Sugg and appropriated to his own use and benefit; that said payment was the proceeds of said escrow notes and was the trust fund for the payment of said Sugg note and the indebtedness; that if said note had not been theretofore paid, as previously alleged, plaintiffs are entitled to have the proceeds of said escrow notes applied to the payment of the $50,000 note.

Further, plaintiffs allege that Sugg was advised, in view of the transfer by Ben F. Johnson, of his one-half interest in the land to Montford T., Neil R., and Graham B. Johnson, that the purchase was made in consideration of the ten promissory notes, and that three of said notes were held under said escrow contract and agreement; that Ben F. Johnson refused to pay off said deed of trust, as he was obligated to do; and that said Ben F. Johnson was at the time of his receipt and appropriation of said note, insolvent, and that they were therefore unable to collect from him the said escrow notes.

Plaintiffs pray for judgment for the title and possession of the land, and that the $50,000 note and deed of trust securing the same be decreed canceled, discharged, and satisfied, and the cloud created thereby upon plaintiffs' land be removed, and any and all title be divested out of defendants and be vested in plaintiffs, and for costs and general relief.

The defendants filed their sworn answer, consisting of general denial, special denial of payment as alleged; also, denial of agency of Ben F. Johnson, and special answer, in substance: That the plaintiff E. B. Johnson and Ben F. Johnson were brothers, and that the other plaintiffs were the sons and the

wife of E. B. Johnson; that on or before the time of the execution of said $50,000 note, E. B. Johnson and Ben F. Johnson were partners engaged in various enterprises in the state of Oklahoma and state of Texas; that as such partners they acquired title to the lands in controversy, using same as a cattle ranch, and while holding title thereto applied to the defendant Sugg for a loan of $50,000, which was made, as evidenced by the note of that amount, and secured by a deed of trust. That said debt was and is a partnership debt of E. B. and Ben F. Johnson; that until the institution of this suit the said Sugg was not advised and did not know that Ben F. Johnson had agreed to assume the payment of said indebtedness; that he dealt with Ben F. Johnson at all times believing that he (Ben F. Johnson) was acting for said partnership; that in sending the note and release to Chickasha he sent it in good faith, believing that Ben F. Johnson was a member of such partnership, and for payment only as a joint obligation of said Ben F. Johnson and E. B. Johnson, and that all acts of said Ben F. Johnson relative thereto, in obtaining and using said note, deed of trust, and release, were in both law and equity the acts of said plaintiffs; that he mailed said note and release to Chickasha, Okl., with specific directions that same was not to be delivered until said note had been paid; that if said Ben F. Johnson wrongfully procured the possession of said note, deed of trust, and release and acted fraudulently therewith, his acts in so doing were the acts also of E. B. Johnson, and if the said E. B. Johnson permitted the escrow notes to pass into the possession of said Ben F. Johnson, his act in so doing was binding on all the plaintiffs, and was in relation to a partnership matter, and their transactions were in no wise binding on the defendants and in no wise a bar to defendants' right of recovery upon said note and deed of trust.

The defendants also allege that should it be held, either in law or equity, that the acts charged above by the defendants did not apply to plaintiffs Montford T., Neil R., and Graham B. Johnson, and that said named plaintiffs are nevertheless entitled to relief prayed for, in any event the defendant Sugg is in no wise estopped against the plaintiff E. B. Johnson and wife, and is nevertheless entitled to personal judgment against him for his money demand and for foreclosure of his interest in said land, alleging in substance that the acts of Ben F. Johnson with defendant Sugg were the acts of the partnership for which E. B. Johnson still is bound in law and equity; the defendants praying that in the event relief be granted the other named plaintiffs, he nevertheless have judgment against E. B. Johnson and wife for the amount of the note and for foreclosure; that Sugg being the owner of said $50,000 note and payee therein and in possession of same,

was advised by Ben F. Johnson that arrangements had been made, or were being made, to take up the note and requesting Sugg to execute a release of the lien and to send the same to the First National Bank of Chickasha, Okl., for payment; that he believed, and had reason to believe, that said Ben F. Johnson was acting for said partnership, and having no notice otherwise, or that said partnership had been dissolved, or that Ben F. Johnson had sold his interest in the partnership property, and having no notice of the placing of said three notes in escrow, he executed said release and sent the same together with the note to Chickasha, Okl., with specific instructions that the same should be delivered only upon payment thereof, the payment to be placed to his credit in said bank; that he had no notice that the papers were ever exhibited to E. B. Johnson; that the money was never paid, and that said note and deed of trust were shortly thereafter returned to defendant; that said note and no part of same was ever paid, and it is yet due and unpaid.

Further, said answer alleges that the acts complained of were committed by Ben F. Johnson and done for said partnership and dealing with a partnership matter, and that the tort committed by him was binding upon and was the act of his copartner, E. B. Johnson; that said E. B. Johnson permitted himself to be imposed on in partnership matters by his partner, Ben F. Johnson, without making any sort of inquiry as to how said papers came into his possession, and relied upon the statements of said Ben F. Johnson, and was thereby induced to permit the escrow notes to pass into his possession; that E. B. Johnson, in so doing, was acting for himself and the coplaintiffs, and his acts were binding upon them, and his act in delivering the escrow notes was the act of the other plaintiffs, and altogether the acts and doings of two partnerships acting among themselves within the scope of their partnership business, for which all are alike responsible in law and equity, and none of the acts being binding in either law or equity upon said Sugg; that the said note, deed of trust, and release were transmitted with specific instructions that same should not constitute delivery and should not be delivered until said note was fully paid or discharged; that at or prior to said time, Ben F. Johnson had enjoyed the reputation of being, not only solvent and financially responsible, but as being a man of upright character and rectitude with a good reputation for fair dealing in all transactions, and that in permitting the papers to come into the possession of said Ben F. Johnson, the defendant Sugg was in no wise guilty of negligence in respect thereto; that he had directed the papers be sent to the bank at Chickasha; that defendant had no knowledge that the papers were otherwise sent, or that they had been exhibited to E.

B. Johnson, or that Ben F. Johnson had made any representations with respect thereto and knew nothing of the matter until the filing of the plaintiffs' amended original petition herein, and that he (Sugg) in all matters acted in good faith and in the usual and ordinary manner of transactions between men of honorable deportment, and that he could not and was not required to foresee that Ben F. Johnson would make use of his position to cheat or defraud the plaintiffs; that the coming of the papers into the possession of Ben F. Johnson was but a bailment without fault of defendants, and that Ben F. Johnson, in breaking same, if he did, in no wise renders the said Sugg liable and in no wise would defeat his right to judgment upon his note and foreclosure of his lien; that the note was a negotiable promissory note, was given in Oklahoma, and was an Oklahoma instrument and governed by the laws of Oklahoma, pleading such laws at length.

Defendants further alleged that at the time of the delivery of the escrow notes to Ben F. Johnson by E. B. Johnson, said E. B. Johnson knew, or should have known, that Sugg had not been paid, and was negligent in not ascertaining that Ben F. Johnson had no authority to deliver said note and release; that plaintiffs delivered said escrow notes and at the time knew, or must have known, that Ben F. Johnson had negotiated the same and had placed them in the hands of an innocent purchaser; that they knew, or should have known, by any sort of diligence, that said $50,000 note, deed of trust, and release had not been paid, but had been returned to Sugg; that said release had never been placed of record; that from 1919 to the date of filing the suit, plaintiffs made no complaint and asserted no invalidity in the $50,-000 note or any infirmity in the deed of trust, and made no complaint to Sugg as to any of his actions until the year 1922, nearly four years thereafter, at which time Ben F. Johnson had become notoriously insolvent and unable to respond in damages, which fact defendants pleaded as an estoppel against plaintiffs' cause of action; that plaintiffs with full knowledge of all the acts and doings of Ben F. Johnson, which were unknown to defendants, and with knowledge imputed that the release had never been placed of record, remained silent for nearly four years, knowing all the time that Ben F. Johnson had taken down the escrow notes and had not placed the release of record, and had failed to make any sort of inquiry of Ben F. Johnson's claims to the discharge of said note and lien until after the insolvency of Ben F. Johnson, by reason of which acts Sugg was led to rely upon his security and to believe that he held a good and valid lien as against all of the plaintiffs; that if Ben F. Johnson obtained possession of said note, deed of trust, and release of same, and exhibited same to E. B. Johnson and told him he had paid the same and promised him that he would send the release and have it recorded in Hutchinson county, and by such means secured possession of the escrow notes, and thereafter negotiated and passed them to innocent purchasers, he thereby obtained possession of said escrow notes by false and fraudulent statements by him made to E. B. Johnson and obtained same in the state of Oklahoma; that such act so committed was a felony under the statutory laws of said state and was the crime of larceny by fraud and in violation of the statute of Oklahoma, fully set out in said pleading; that said act was in violation of the statutes and criminal laws of Oklahoma constituting a felony and was the proximate cause of the loss, if any, sustained by plaintiffs.

Defendants pray that plaintiffs take nothing by their suit. This pleading is then followed by their cross-action seeking recovery upon the $50,000 note and foreclosure of their lien upon the land.

The plaintiffs filed their first supplemental petition, in which they allege, substantially, general and special exceptions, and special answer that none of the plaintiffs were partners with Ben F. Johnson; that none of plaintiffs were present with Ben F. Johnson at any time and were not the procuring cause of the loan made by Sugg to him; that the $50,000 was in fact advanced by Sugg to Ben F. Johnson; that E. B. Johnson had the sole and entire management of the general business with Ben F. Johnson, and they specially denied that the $50,000 note was a partnership or joint obligation; that E. B. Johnson and wife signed the note and deed of trust for the accommodation of Ben F. Johnson, and that E. B. Johnson was but a surety on said note and received no proceeds or benefit from said note, which fact was well known to the defendant. Further, that they were not advised of the conditions under which the note and papers came into possession of Ben F. Johnson, or that there were any conditions attached to the delivery of said note, deed of trust, and release; pleading certain of the negotiable instruments statutes of Oklahoma.

By way of reply, the defendants filed their supplemental answer consisting of a general demurrer, a special denial of all matters pleaded in the supplemental petition, and a denial under oath of the agency of Ben F. Johnson.

Ben F. Johnson and wife filed their original answer and an admission of indebtedness under defendants' cross-action.

The trial court having overruled the defendants' exceptions, the case proceeded to a trial and was submitted to a jury upon special issues. On the jury's answers to the issues submitted, the court rendered judgment canceling the $50,000 note and deed of trust, for costs against Sugg and Kirkpatrick, denying judgment for defendants against

Ben F. Johnson and wife, and against Sugg and Kirkpatrick on the cross-action, and from such judgment appeal is taken to this court.

There are certain questions presented on this appeal which we deem of controlling importance, which will first be discussed by us, we making no effort to discuss appellants' propositions in the order of their presentation in their brief.

Appellees plead payment of the Sugg $50,-000 note. The trial court submitted that issue to the jury as follows:

"Question No. 1. Has the $50,000 note, dated St. Angelo, Tex., August 9, 1916, payable to J. D. Sugg, executed by Ben F. Johnson, being the note in controversy in this suit, been paid? Answer yes or no."

[1] This question was answered by the jury in the affirmative. If their answer is sufficiently supported by the evidence, it is decisive of the matter, and the trial court would have, in that event, no authority to set it aside or to ignore it. Northern Assurance Co. v. J. W. Lawrence (Tex. Civ. App.) 278 S. W. 476; Nowlin v. Hall, 97 Tex. 441, 79 S. W. 806; Hodde v. Malone Real Estate Co. (Tex. Civ. App.) 196 S. W. 347; Mansfield v. Rigsby (Tex. Civ. App.) 273 S. W. 290, 291.

[2] Considering the evidence introduced and before the jury, does it show the payment of the $50,000 note?

Ben F. Johnson, the partner of E. B. Johnson, sold his undivided half interest in the land in controversy to his nephews, sons of E. B. Johnson, taking their ten vendors' lien notes, each for the sum of $17,711. Of these notes, three were placed by the parties in escrow in the bank at Norman, Okl., to be held there and not to be delivered to Ben F. Johnson until he had paid off and discharged the $50,000 note owing to Sugg and caused a release to be executed by Sugg of the mortgage held by him to secure the payment of said note, upon the land in controversy. This escrow agreement was reduced to writing, signed by the parties on the 2d day of July, 1919, and the three notes and agreement were duly deposited in the Norman bank.

E. B. Johnson testifies that he received a letter from Ben F. Johnson, copy of which was in evidence, informing him that he (Ben F. Johnson) was arranging for a loan on the notes given him in payment of his part of the ranch with parties at Minneapolis, Minn., and requesting that all of the papers including the three escrow notes, be sent him for that purpose; this letter was dated August 13, 1919; that about the 22d day of August, 1919, he went over to Chickasha and there met Ben F. Johnson in the First National Bank of Chickasha, Okl., of which bank Ben F. Johnson was active vice president and managing officer; that he there had a conversation with said Ben F. Johnson, and at that time said Ben Johnson showed him a release of a mortgage, the trust deed, and the $50,000 Sugg note; that at the time Ben Johnson showed him these papers he told him (E. B. Johnson), "I have paid off the Sugg loan," and wanted him to send the three escrow notes then in the Norman bank, and again stated, "I have paid off the Sugg loan, and I would like for you to send over those notes, the boys notes, and I will send this release and have it recorded," and at that time showed E. B. Johnson the release.

F. L. Slusher, cashier of the Chickasha bank during the transactions in controversy here, testified that he knew Sugg and Ben Johnson; that Sugg was a member of the board of directors of that bank and a stockholder in the bank; that he was familiar with the bank's books and records; that the individual ledger, A to K, No. 92, as dated September 15, 1919, shows that Ben Johnson had an account in the bank; that this ledger, the individual accounts carried by the bank from the letter A to K, Ben Johnson's account in that book, on September 15, 1919, is shown to have two credits, one of $49,323.-33 and one of $50,000. Individual ledger No. 92, L to Z, shows a balance to the credit of Ben Johnson at the close of business that day of $187,278.01. The account of J. D. Sugg under date of September 27, 1919, shows one credit of $50,000; that is, the account of Sugg shows a deposit in the bank to his credit on that day of $50,000, making balance of his account on that date the sum of $11,608.14; his account on the previous day having been overdrawn $38,391. Two deposit slips showing the two credits of Ben Johnson's account are above set out. A deposit slip, in the handwriting of Ben Johnson, showing by its date that the deposit was made September 26, 1919, was introduced, which the witness testifies was evidently made after banking hours, and which was credited to Sugg on September 27, 1919.

When Ben Johnson wrote to Sugg to send him the release, he at that time, and in that letter, informed Sugg what he expected to do with it; that he was arranging to get the money with which to pay the $50,000 note from Minneapolis parties. In his letter, dated August 9, 1919, in which the release is requested, Ben Johnson stated to Sugg that upon receipt of the release he would send Sugg a receipt; that same was to be delivered only upon the deposit of $50,000 and interest to his (Sugg's) credit. In answer to this letter, Sugg had Kirkpatrick write Ben Johnson, under date August 20, 1919, inclosing the note and release, in which letter Kirkpatrick says:

"Mr. Sugg instructs me to send all these papers to the First National Bank, of Chickasha, Okl., with instructions that the release and note to be delivered only when the money with all interest is placed to his credit in your bank."

E. B. Johnson was informed that Ben Johnson was arranging to get the money from the Minneapolis parties to pay off the Sugg $50,-000 note, and it was clearly the intention of Ben Johnson to get the money from that source to pay Sugg that particular note, and on his failure to so do, he returned the release and note to Sugg, as he had impliedly agreed to do.

Against this evidence, the appellees rely upon the deposit indicated above, as showing that the note was paid, as required by Sugg, before the note and release were delivered. Further, appellees contend, even if the deposit of $50,000 made to Sugg's credit was not made for the purpose of paying the $50,000 note, that as their debt was the oldest, and as Sugg gave no directions as to how the money was to be applied, it should have been applied to the payment of that note, instead of being credited on other debts due and owing to Sugg. Again, appellees claim that Sugg, in his conversations with them, stated that Ben Johnson had got his business all mixed up, and that he did not know whether the note had been paid or not. In fact, if the note had not been paid, this statement would have no probative force to bind Sugg.

It is uncontroverted that Ben Johnson was negotiating with Minneapolis parties for certain money; that it is equally clear that he intended to pay Sugg's note out of this money. Of this, Sugg and E. B. Johnson were both informed. When Ben Johnson failed to get the money, he returned the note and release to Sugg. Consequently, it was not his intention, nor Sugg's intention, that any other money was paid or to be applied on this note. The note was to be paid when Ben Johnson closed his deal with the Minneapolis parties—that was the representation made by Johnson to Sugg and to E. B. Johnson. This was clearly not a settlement of the note.

The witness Ben Johnson explains the deposit placed to Sugg's credit as follows: When he found that the Minneapolis parties would not make him the loan, he ordered the draft and papers sent back from Minneapolis, and this made it necessary for him to get the $138,000 which he had been credited with when the draft was placed in the "in transit account" in the Chickasha bank and to repay that bank, and on September 9, 1919, he charged Sugg's personal account in the First National Bank of Chickasha with $50,000 for the reason that he and his partner, Campbell, had been using Sugg's money in that bank to relieve their need for money, and further testifies:

"It is true, as testified by Mr. Slusher, that the charge against Mr. Sugg's account effected an elimination, it took out of the drawer a cost item of Campbell & Johnson, that is some paper of Campbell & Johnson being carried in the drawer that I took out with that debit charge I made against Mr. Sugg, and it is true that Campbell & Johnson got the benefit of that we charged Mr. Sugg on September 9th. We used his money, but Mr. Sugg knew nothing about it. At the time that charge was made, Mr. Sugg's balance in the account, as well as I remember, was something like $9,000."

On September 16, 1919, Sugg, being apprised of the amount to his balance, wrote Ben Johnson to have the bank place $25,000 in the bank at Bartlett, Tex., and $25,000 in the bank at Granger, Tex., to his (Sugg's) credit and to let him know when he had done so. Ben Johnson testifies:

"After I had charged Mr. Sugg's account with $50,000 on September 9, 1919, there was not enough left for me to make these two transfers as requested by his letter, to Bartlett and Granger, and so Mr. Campbell and myself drew a draft on Mr. Sugg for $50,000 and attached to that draft a $100,000 note of Campbell & Johnson, that is, of Mr. C. B. Campbell and myself, and placed that draft, together with that note, in the bank and gave Mr. Sugg credit for it, that is, credit for $50,000."

This was done, as the witness testifies, because they had used $50,000 of Sugg's money on September 9th, and, inasmuch as it was necessary for them to have $50,000 for him for his oil mills in Texas, they had to place that money back in his account by drawing the sight draft on him and crediting his account with that amount. The sight draft on Sugg, with the $100,000 note attached, was carried in the cash items of the First National Bank of Chickasha and was never sent out for collection, and Sugg never knew anything about it. In October Sugg loaned Campbell & Johnson $200,000, and out of that loan the $50,000 draft was taken up.

The facts stated are practically uncontradicted, hence they more than rebut any presumption of payment by reason of deposits made to Sugg's credit. Not only do they rebut such presumption, but they clearly show that the $50,000 Sugg note was never paid.

[3] The answer of the jury to issue No. 1, that the $50,000 note had been paid, is not only unsupported by the evidence, but is directly in face of the evidence. As the evidence does not warrant the jury's finding, it was the duty of the trial court to set aside such verdict. Swearingen v. Swearingen (Tex. Civ. App.) 193 S. W. 442, 445, writ denied; Gulf, etc., R. Co. v. Clements (Tex. Civ. App.) 203 S. W. 623; Canode v. Sewell (Tex. Civ. App.) 182 S. W. 421; Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059.

Appellants insist that the undisputed evidence showing that the $50,000 note to Sugg was the joint partnership obligation of Ben F. Johnson and E. B. Johnson, and that the note in controversy never having been paid, it was error on the part of the court to refuse to instruct the jury to return a verdict in favor of defendant Sugg for the amount of the note, interest, and attorney's fees as against the original makers and for a foreclosure of their interest in the land covered by the deed of trust, because the acts and statements of

Ben F. Johnson relative to the payment of the note, if made, were but the acts and statements of one partner concerning a partnership transaction, for which all of said joint makers were responsible, and could not form the bases of an estoppel as against the defendant Sugg in favor of the joint makers.

[4, 5] There is no question but that a partnership was formed between E. B. and Ben Johnson, and that at the time the $50,000 note was executed such partnership existed. The question here presented is: Was the note a partnership obligation, or was it the individual obligation of Ben Johnson, only, as principal, and of E. B. Johnson as a surety. Ben Johnson testifies that it was a partnership obligation; Sugg testifies that E. B. Johnson first spoke to him about the loan and that he understood it was a partnership matter. There are other facts and circumstances indicating that it was a partnership indebtedness, such as the appropriation of about $8,-000 of the loan to the use of the partnership; but there are other circumstances indicating that it was the individual loan of Ben Johnson, and E. B. Johnson testifies that it was the individual loan of Ben Johnson, and the real and whole consideration of the trade where Ben Johnson bought into the partnership is not made to appear clearly. This being the status of the question under the evidence, and no special issue having been submitted to the jury and none requested of the court by appellants, we must indulge the presumption that the trial court found that the giving of the note was a personal transaction of Ben Johnson with Sugg.

Article 1985, V. S. C. Statutes 1914, provides that the trial court must submit all issues made by the pleading, but that the failure to submit any issue shall not be deemed a ground for reversal of the judgment unless its submission has been requested in writing by the party complaining, and an issue not submitted and not requested by a party to the cause shall be deemed as found by the court in such manner as to support the judgment, provided that there is evidence supporting such finding. The trial court having rendered judgment for the plaintiffs, and the question as to whether or not the note was a partnership transaction, the presumption is that he found upon the issue in such manner as to sustain the judgment; and, there being evidence to support such finding, we hold that such finding cannot be set aside. Lancaster v. Richardson (Tex. Civ. App.) 45 S. W. 409; Phœnix Ins. Co. v. Moore (Tex. Civ. App.) 46 S. W. 1131; Devine v. U. S. Mort. Co. (Tex. Civ. App.) 48 S. W. 585; Texarkana & Ft. S. Ry. Co. v. Spencer, 28 Tex. Civ. App. 251, 67 S. W. 196.

Appellants assign error in the submission by the trial court to the jury as to whether or not Ben Johnson exhibited the $50,000 Sugg note and the release executed by Sugg, to E. B. Johnson, and state to E. B. Johnson that said note had been paid, and, if so, did E. B. Johnson rely thereon, and surrender the three escrow notes, for the reason that the plaintiffs did not, by a fair preponderance of the evidence, discharge the burden resting on them to prove their plea of estoppel as against defendant Sugg, and that the acts and declarations of Ben Johnson complained of by appellees were not acts which the appellant Sugg could be held liable for by reason of negligence, and that Sugg, having delivered the note to Ben Johnson, by doing so he was not guilty of an act of negligence, and for the further reason that Sugg could not anticipate that such act would enable Ben Johnson to, or that he could, defraud E. B. Johnson.

[6] "Estoppel" in general is defined as:

"A bar which precludes the person from denying the truth of a fact which has in contemplation of law become settled by the acts and proceedings of judicial or legislative officers, or by the act of the party himself, either by conventional writing or by representations, express or implied, in pais. To use the quaint language of Lord Coke, it is so called 'because a man's owne act or acceptance stoppeth or closeth his mouth to alleage or plead the truth.'" 21 C. J. § 1, pp. 1059, 1060.

[7] The term "estoppel by negligence" is applied to—

"Cases where a man is estopped by another's misrepresentation, if in breach of some duty to the person deceived, he has supplied the person making the misrepresentations with that which will necessarily make it credible." 21 C. J. § 8, p. 1060.

Under the definition just quoted from Corpus Juris, we are cited to cases in which it is held that where one of two innocent persons must suffer, the loss is thrown on him by whose negligence the damage is occasioned. We recognize this rule in the cases or conduct in the matter of transfers of negotiable instruments, and also we recognize such rule where a party owes a duty to another, and by his acts and declarations, or even by silence, designedly induces another to alter his position in a manner injurious to himself. But we cannot see that these rules are applicable to the transaction here being considered. Sugg is not shown to have had any knowledge of the fact that Ben Johnson had deposited the three escrow notes under the contract that they were to be delivered only on payment of the note held by him. E. B. Johnson says that he had implicit confidence in the honor and integrity of his brother Ben Johnson; Sugg testifies that he regarded Ben Johnson as a man of integrity and high business standing, and evinces this confidence in him by loaning him, or his firm, Campbell & Johnson, at a later date, $200,000. It is clear that the note was sent to Chickasha National Bank, of which Ben Johnson was active vice president and managing director, with instructions to the bank to deliver it only when the money was paid. As stated,

Ben Johnson was the active manager of the bank and its business; he was in the bank when E. B. Johnson claims that he showed him the release and note; E. B. Johnson knew of the intimate relations and business connection of Sugg with the bank; it is not clear from his testimony that he relied on the release or on the statement of Ben Johnson, as an honorable man, that he had paid the note. Sugg could have had no intention to have this release and note shown to E. B. Johnson to his injury, for, as stated above, he is not shown to have had any knowledge of the escrow notes having been put up in the Norman bank.

Did Sugg owe any duty to E. B. Johnson which would have required that he decline to send the note to the Chickasha bank, or to Ben Johnson, as the active head and manager of same? Upon what theory? Certainly not on the theory that he intended to defraud him by aiding Ben Johnson to do so, for his want of knowledge of the conditions of the escrow agreement would negative that, and there was no apparent benefit to accrue to Sugg from such conduct. Lacking in knowledge of E. B. Johnson's condition with reference to the escrow notes, he can have had no intention to have had the note and release exhibited to him, and could not have anticipated that they would be used by Ben Johnson to effect an ulterior purpose, and E. B. Johnson's loss was not the natural and probable consequence of his act in sending the note and release to Ben Johnson.

It does not appear from the evidence that Sugg was guilty of such negligence as would estop him from claiming that the release was not sent with the intention of having it exhibited to E. B. Johnson and be governed by its recitals. Being the active managing director of the bank, Ben Johnson was the officer of the bank into whose hands the notes and release would come in the ordinary course of the bank's business. The letter Sugg had written, inclosing those papers, gave the bank instructions as to what he wanted done with them. It was anticipated that the instruments were to be sent along with the other papers to the party contemplating making the loan that they might be paid off and discharged, so that the lien to be retained by the new lenders might be a first lien and not be subordinate to Sugg's lien; in other words, both as to the notes executed by plaintiffs and that held by Sugg, they wanted to have the prior lien. This was done in the due course of business and was not negligence in law.

In the case of Wilson v. Green, 25 Vt. 450, 456, 60 Am. Dec. 279, where the creditor expressly consented that the sureties be made to believe that the debt had been paid, and be made to forego any advantage they would otherwise have had, the court held that the sureties were released from their contract in equity, and equally at law, and says:

"We think, if the note had been given up to the principal for some honest purpose, as to enable him to make a disclosure, describing the note, and he had represented to the sureties that it was paid, and even torn off their names or destroyed it, it would not have released them, if the creditor took the earliest opportunity to correct this misapprehension. Gordon v. McCarty, 3 Whart. [Pa.] 407."

Another requirement of estoppel is that the conduct of the party against whom it is urged must have been with the intention of having it acted on by the person to be effected or injured. Bigelow on Estoppel, § 7, p. 684.

"One of the grounds why the defendant could not make out an estoppel against the plaintiff was that the statements in question had been communicated to her (defendant) without authority from the plaintiff. A person who receives statements at second hand, not intended for him, clearly has no right to act upon them." Big. on Es. § 8, pp. 708, 709.

Not only must the negligence of Sugg have been the natural and proximate cause of plaintiffs' damage and of his surrender of the escrow notes, for negligence itself does not point to any particular result, but the legal consequence of such negligence, that loss ensued to E. B. Johnson, must appear to have been the necessary or proximate result, because Sugg, lacking knowledge, owed him no duty. Big. on Es. § 10, pp. 711, 712.

When one by his conduct intentionally or willfully causes another to believe a certain state of things, and induces him to act on that belief so as to alter his previous position to his injury, the former is concluded from averring against the latter a different state of things as existing at the same time; but such conduct, it is said, must be willfully, knowingly, intentionally, or culpably committed. Timon v. Whitehead, 58 Tex. 290, 295; Burleson v. Burleson, 28 Tex. 383, 384; Woods v. Lowrance, 49 Tex. Civ. App. 542, 109 S. W. 418.

[8] It becomes a material inquiry, under the case as made by the evidence, to determine whether or not E. B. Johnson was guilty of negligence in surrendering the escrow notes without further inquiry; hence the court should have submitted that issue to the jury as requested by the defendants.

[9] It was error for the trial court to instruct the jury that the burden was on the defendant Sugg to prove that in delivering the note to Ben Johnson he exercised such reasonable care and caution as an ordinarily prudent person would exercise under like or similar circumstances. The gist of plaintiffs' charge of negligence on Sugg's part was that by his negligence he injured them and was thereby estopped from asserting his rights under the note.

We have considered all of appellants' assignments and propositions. Some of the questions presented will not arise on another trial, and the others, not expressly consid-

ered above, do not present reversible error and we overrule them.

For the errors indicated, the judgment of the trial court is reversed and remanded for another trial.

### On Appellees' Motion for Rehearing.

Appellees in their motion for rehearing charge us with 49 errors in our original opinion. However, we have some consolation in finding that after an analysis of the 49, the number is largely reduced because of the fact that many are directed at the same holding, only varied in form.

We do not care to further discuss appellees' claim that the evidence shows that Sugg's $50,000 note was paid. We have said all that we desire to say on that question in the original opinion. But we do desire to discuss appellees' charge, contained in their written argument, that the finding of this court that the note was sent to the Chickasha bank, of which Ben Johnson was vice president and managing director, with instructions to the bank to deliver it only when the money was paid, "is without a line of testimony to support it." A casual reading of the record will disclose that this statement is not true.

Both Ben and Ed. Johnson were interested in the bank. Ed. Johnson knew that Ben Johnson was the managing officer of the bank, in full control of its business affairs. Each party seems to have been possessed of a degree of confidence in the other that may not have been warranted, judging from charges and counter charges disclosed by the record. Ben Johnson wrote to Sugg and told him to send him the note and release, that he was arranging a loan with Minneapolis parties, and as soon as he got the money he would pay the note. In answer to this, Sugg had his secretary, Kirkpatrick, write a letter inclosing the note and release. To whom were they sent by Sugg? Kirkpatrick testifies that he addressed the letter in which these papers were inclosed to Ben Johnson, personally; but this was not the instruction given him by Sugg. The letter to Ben Johnson, written by Kirkpatrick, clearly shows that Sugg had instructed him to send the note and release to the bank to be delivered only on payment of the note; this letter, inclosing the note and release, was addressed to Ben Johnson, but it told Ben Johnson what Sugg's instructions to Kirkpatrick were, and, if they were sent to him personally, it told him in plain English that Sugg had ordered them sent, not to him (Ben Johnson), but to the First National Bank of Chickasha, and gave evidence on its face that Kirkpatrick had violated his instructions. It was sent to the man who had charge of the bank's business and gave him, as vice president of the bank, full notice of what his bank was to do with it, and also gave him notice that it was a bank matter and not a personal matter that had come to his hands. Suppose that these papers had been sent to the bank under the address, First National Bank, Chickasha, Okl., and, as managing director in charge of the business of the bank, Ben Johnson called Ed. Johnson in and showed him the note and release? Would there not then be only a violation of the like kind of duty that devolved on him as in the case under the facts before us? Would there have been any difference in the degree of the violation of his duty? Under the facts stated, we hold, as a matter of law, that the note and release having come into the hands of Ben Johnson with appropriate instructions, there was a delivery to the bank for the purposes stated in the letter of instructions. Ben Johnson may have been possessed of two personalities, but when it comes to a breach of the duty set out in his letter, only one was called on to act; that is, he was called on to act as manager of the bank.

The intention was that Ben Johnson, as vice president, should act for the bank on receipt of the letter, and not that Ben Johnson should do as he pleased with the papers. A delivery to Johnson personally, at all events, was not intended. Hence there was no delivery to him, personally, notwithstanding the error in addressing the envelope made by the secretary. Hier v. Harpster, 76 Kan. 1, 90 P. 817, 13 L. R. A. (N. S.) 204, 13 Ann. Cas. 919.

Appellees vigorously assail our application of the holding in the case of Wilson v. Green, 25 Vt. 450, 456, 60 Am. Dec. 279, that—

"If the note had been given up to the principal for some honest purpose, as to enable him to make a disclosure, describing the note, and he had represented to the sureties that it was paid, and even torn off their names or destroyed it, it would not have released them, if the creditor took the earliest opportunity to correct this misapprehension."

Appellees contend: First, that this holding in the Wilson Case is purely dicta; second, that the subsequent case of Blodgett v. Bickford & Tate, 30 Vt. 731, 73 Am. Dec. 334, where the holder of a note surrendered it before maturity, believing it to have been paid and upon discovering his mistake notified the sureties that the note had not been paid and that he would look to them for payment, and such sureties were held not to be released, counsel quote as overruling the Wilson holding from that decision as follows:

"If the defendant Tate [surety] had security from Bickford [principal] to indemnify him against liability in consequence of signing said note, * * * or if the note had become due, so that he could have paid it and then secured himself therefor against Bickford, or had been deprived of any legal right existing, between himself and Bickford, in consequence of the surrender of the note or of the plaintiff's neglect to give him notice so as to change the legal and

equitable relations existing between them, the case might then merit a different consideration."

We do not believe that the rule announced in the Blodgett Case, and set out above, changes or affects the rule laid down in the Wilson Case. The quotations from the Blodgett Case certainly is not the law in Texas, without many limitations. The delivery of an instrument marked paid, without any fraud, and only by mistake, does not change the status of the surety. Our Texas courts have held where an original note is delivered to a bank with the genuine signatures of the principal and sureties thereon, and the bank afterwards surrenders such note and takes in lieu thereof a renewal note with the signatures of sureties forged, suit may be maintained by the bank upon such original note, and that the surety is not released by the act of the bank in surrendering such note and accepting a renewal note. Officer et al. v. Marshall et al., 9 Tex. Civ. App. 428, 29 S. W. 246; Red River Nat. Bank v. Bray, 105 Tex. 312, 148 S. W. 290, 292. See, also, Kincaid v. Yates, 63 Mo. 45.

The purpose of Ben Johnson, as disclosed by his letter to Sugg, and by the other evidence in the case, being to secure the note and release to enable him to borrow money on the land upon which it was a lien, we cannot see that Sugg's sending the note and deed of release was any more of an act of negligence than the sending of the note alone. The note was made payable at the said bank, and the release would naturally in due course of business have been sent to the place where the note was made payable. The lender would demand that prior liens be released before taking up the outstanding liens.

Motion for rehearing overruled.

JACKSON, J., not sitting.

## On Appellants' Motion for Rehearing.

WILLIAMS, Special Judge. I have considered all the assignments of error presented by the appellants, and except as herein stated, I concur with the disposition made thereof by Associate Justice RANDOLPH in his original opinion herein, and concur in the disposition made of this appeal in reversing the judgment and remanding the case for another trial, because of the error of the trial court in refusing to submit to the jury the issue of E. B. Johnson's negligence in surrendering the escrow notes without further inquiry, and by reason of the error of the trial court in placing upon Sugg the burden of proof to show that he was not guilty of negligence in surrendering the note and deed of trust to Ben Johnson.

The court having submitted to the jury the question of negligence or not, on the part of Sugg in delivering the note and release to Ben Johnson, then, as requested by the appellants, the court should have submitted the question of whether or not E. B. Johnson was negligent in delivering to Ben Johnson the three notes held in escrow without making further inquiry as to the payment of the $50,000 note. The note in question was payable at the Chickasha bank, where E. B. Johnson saw it in the hands of Ben Johnson, the managing officer of such bank, and E. B. Johnson knew of the relationship existing between Sugg and Ben Johnson, and knew of Ben Johnson's intention of procuring the money from Minneapolis parties with which to finance the purchase of the one-half interest in the ranch and discharge the Sugg note. In the light of these facts, it became material as to whether E. B. Johnson actually relied upon the note and release in the hands of Ben Johnson, and, if so, was he negligent in relying thereon without making further inquiry as to whether the note had actually been paid by Ben Johnson. Corpus Juris, vol. 21, § 175, pp. 1169, 1170; Herman on Estoppel, § 969, p. 1092.

[10] I do not concur, however, in the holding, as stated by Justice RANDOLPH in the original opinion and opinion on motion for rehearing, that under the evidence Sugg was not, as a matter of law, estopped from denying, in so far as E. B. Johnson was concerned, that the $50,000 note had been paid and the lien released. The letter inclosing the note, deed of trust, and release, which was written by Kirkpatrick at the request of Sugg and as his agent, was addressed to Ben Johnson, although it is not clear as to whom the envelope containing same was directed. That the note, deed of trust, and release were in the possession of Ben Johnson, the principal obligor, and by him exhibited to E. B. Johnson, is not controverted. The case having been tried, apparently, upon the theory that if Sugg was estopped, it was estoppel in pais, or equitable estoppel in which the question of negligence on the part of Sugg became a material issue, and the issue of whether Sugg was guilty of negligence in sending the instrument to Ben Johnson having been submitted to the jury and having been answered in the affirmative, and the evidence being sufficient to support such finding, and such finding being equivalent to a finding that the instruments were sent to Ben Johnson, the assignment of error of appellants to the submission of the issue to the jury should be overruled, and this, although the evidence does not show that Sugg had any intention that Ben Johnson should exhibit such instrument to E. B. Johnson, or that E. B. Johnson should act thereon to his detriment.

[11] Estoppel in pais, or equitable estoppel, may be based upon negligence, and it is not essential that the party estopped should have intended by his acts that the injured party should act thereon, nor is his bad faith or intentional moral wrong necessarily a matter of consequence. See Pomeroy's Equity Juris-

prudence (2d Ed.) § 811, where the rule is stated as follows:

"It has frequently been said, in most general terms, that the conduct amounting to a misrepresentation, in order to constitute an estoppel, must be done with the intention, by the one who is estopped, that it shall be acted upon by the very person who claims the benefit of the estoppel, or, as is sometimes said, that it shall be acted upon by another person. In short, there must always be the intention that the conduct shall be acted upon either by some person, or by the very person who relies upon the estoppel. While such intention must sometimes exist, and while the proposition is therefore true in certain cases, it would be very misleading as a universal rule. In many familiar species of estoppel no intention can possibly exist. The requisite, as applicable to them, is well expressed by an eminent judge in a recent decision: It is not 'necessary in equity, that the intention should be to deceive any particular individual or individuals. If the representations are such, and made under such circumstances, that all persons interested in the subject-matter have the right to rely on them as true, their truth cannot be denied by the party that has made them against any one who has trusted to them and acted on them. * * * Where a man makes a statement in a manner and under circumstances such as he must understand those who heard the statement would believe to be true, and if they had an interest in the subject-matter would act on as true; and one, using his own means of knowledge with due diligence, acts on the statement as true, the party who makes the statement cannot show that his representation was false, to the injury of the party who believed it to be true, and acted on it as such; that he will be liable for the natural consequences of his representation, and cannot be heard to say that the party actually injured was not the one he meant should act,' citing Horn v. Cole, 51 N. H. 287, 12 Am. Rep. 111, per Perley, C. J."

There is a theory which makes the essence of equitable estoppel to consist of fraud, and the language used by some courts in defining and describing the general doctrine has been so sweeping and positive that, taken literally, it does not admit the possibility of such an estoppel unless the party has been guilty of actual intentional fraud in law. This theory is not sustained by principle and cannot be made universal. In Pomeroy's Equity Jurisprudence (2d Ed.) § 803, it is stated:

"It is undoubtedly in accordance with the methods long pursued by the courts of equity to apply the term 'fraudulent' to the party estopped, in the following manner: It is in strict agreement with equitable motions to say of such party that his repudiation of his own prior conduct which had amounted to an estoppel, and his assertion of claims notwithstanding his former acts or words would be fraudulent—would be a fraud upon the rights of the person benefited by the estoppel. It is accurate, therefore, to describe equitable estoppel, in general terms, as such conduct by a party that it would be fraudulent, or a fraud upon the rights of another, for him afterwards, to repudiate and to set up claims inconsistent with it. The use of the term has long been familiar to courts of equity, which have always treated the word 'fraud' in a very elastic manner. The meaning here given to fraud or fraudulent is synonymous with 'unconscientious' or 'inequitable.' "

See, also, sections 710, 711, 804, 805, Pomeroy's Equity Jurisprudence (2d Ed.); Corpus Juris, vol. 21, p. 1120, § 124; also, section 175, p. 1169; Williston on Contracts, vol. 1, § 35, p. 53. In the case of Sessions v. Rice, 70 Iowa, 306, 30 N. W. 735, the following comment is made with reference to intent:

It is "probably true, as the court found, that the appellee did not intend to release Mason. But such fact does not show that the appellee is not estopped. It probably seldom happens that a person who becomes estopped by his conduct intended to estop himself. Estoppel is a legal result, entirely independent of an intention to create an estoppel."

[12] The note and release of deed of trust having been placed in the hands of Ben Johnson, the principal obligor, it cannot be said that it was in his hands as an escrow holder. The rule as announced in the case of Holt v. Gordon, 107 Tex. 137, 174 S. W. 1097, appears to have been uniformly followed by the courts in this state. In passing upon the question, it was held in the opinion of Chief Justice Phillips:

"It may be shown by parol testimony that an ordinary written instrument was executed under an agreement that it was not to become effective except upon certain conditions. * * * But that principle has never been recognized by this court as applicable to a deed to land, * * * where the delivery of the instrument was made to the grantee, and not to a third person. It has, upon the contrary, been distinctly held that a deed or deed of trust cannot be an escrow where it is delivered to the grantee in the instrument." Heffron v. Cunningham, 76 Tex. 313, 13 S. W. 260; Manton v. City of San Antonio (Tex. Civ. App.) 207 S. W. 951.

. It would seem that one who signs and acknowledges a conveyance to be delivered only upon condition may be estopped as against innocent third parties to set up nondelivery, by negligently permitting it to pass into hands of the grantee. Steffian v. Milmo National Bank, 69 Tex. 513, 6 S. W. 823; Link v. Page, 72 Tex. 592, 10 S. W. 699. The note and release of deed of trust having been sent by Sugg to Ben Johnson, the maker of the note and the grantee in the release, or negligently sent to the bank of which Ben Johnson was the managing officer, thereby permitting such note and release to come into the hands and possession of Ben Johnson, it would have the legal effect of an unconditional release of the deed of trust lien in so far as E. B. Johnson is concerned, provided he in good faith, and not through carelessness, relied upon the same and by reason thereof surrendered to Ben Johnson the three escrow notes.

Appellants' motion for rehearing is overruled.

HALL, C. J. I concur in the disposition made of this appeal, because I think the court erred in refusing to submit to the jury the issue as to E. B. Johnson's negligence in surrendering the escrow notes without further inquiry; but I do not assent to the holding that Sugg has not himself been guilty of such negligence as would estop him from recovering upon the note. I also agree with all Judge WILLIAMS has said in regard to the estoppel of Sugg.

The jury found, in response to the fourth special issue, that in delivering the $50,000 note and the deed of trust securing the same, together with the release of the deed of trust, to Ben Johnson, Sugg did not exercise such reasonable care and caution as an ordinarily prudent person would exercise under like or similar circumstances. This finding is tantamount to a finding that Sugg was guilty of negligence in sending the instruments to Ben F. Johnson, and the evidence is amply sufficient to sustain the finding. This being true, Sugg would not be entitled to recover upon this phase. of the case unless E. B. Johnson was guilty of such negligence as would deprive him of the right to plead the negligence of Sugg as an estoppel. The courts of Texas have long recognized and enforced the maxim that, "He who trusts most must suffer most," and I am of the opinion that the act of Sugg in negligently sending these papers to Ben Johnson, or to the bank of which he was the managing officer, thereby making it possible for him to defraud and impose upon the public, has brought him within the rule. Kesler v. Zimmerschitte, 1 Tex. 50; Roman v. Serna, 40 Tex. 306; Stevens & Andrews v. Gainesville National Bank, 62 Tex. 449; Marx v. Elsworth, 2 Posey, Unrep. Cas. 83; Neale v. Sears, 31 Tex. 105; Jones v. Prim, 6 Tex. 170; 21 C. J., pp. 1169–1176; Home Savings Bank v. Stewart, 78 Neb. 624, 110 N. W. 947; National Safe Deposit Savings & Trust Co. v. Hibbs, 229 U. S. 396, 33 S. Ct. 818, 57 L. Ed. 1241.